Fiol Matta, Jueza Ponente
*1091 TEXTO COMPLETO DE LA SENTENCIA
Los apelantes, Ernesto Domínguez Casuel, Migdalia Ramírez Rodríguez, Dalimar Domínguez Ramírez, Ménica Domínguez Ramírez y Ernesto A. Domínguez Ramírez nos solicitan que revoquemos la sentencia dictada el 2 de mayo de 2000 por el Tribunal de Primera Instancia, Sala Superior de San Juan, mediante la cual se desestimó la demanda en daños y peijuicios incoada por éstos. Examinado el expediente apelativo y a la luz del derecho aplicable, confirmamos la sentencia dictada por el tribunal de instancia.
I
El 5 de abril de 1992, Ernesto Domínguez Casuel y Migdalia Ramírez Rodríguez, en adelante los Domínguez-Ramírez, demandaron en daños y perjuicios al Dr. Juan R. González Aristud, al Hospital San Jorge y al Dr. Germán Malaret. Expusieron que el 23 de junio de 1992, el doctor González realizó una histerectomía a la señora Rodríguez “por tener la matriz muy débil y porque tendría problemas en el futuro” y que como resultado de ésta, la señora Rodríguez sufrió daños permanentes. Específicamente, alegaron que mientras estaba en la sala de recuperación, a la señora Rodríguez se le formó un coágulo de sangre en su pierna derecha, lo que al día siguiente se diagnosticó como tromboflebitis y que tuvo que ser intervenida quirúrgicamente por segunda ocasión para removerle dicho coágulo. Fue dada de alta del Hospital el 13 de julio de 1992.
Los Domínguez-Ramírez también alegaron que la herida continuó supurando y sangrando después de la segunda operación, ocasionándole a la señora Ramírez dolores e incomodidades, limitándole sus movimientos y obligándole a utilizar andador y bastón. Además, fue necesario recurrir a un cirujano estético, recomendado por el doctor González, para que cerrara la herida. La cirugía estética se realizó el 21 de octubre de 1992, pero el dolor en la pierna continuó y también-le falseaba la rodilla.
Según la demanda, el 13 de noviembre de 1992, el doctor Malaret diagnosticó artritis como causa de la cojera de la señora Ramírez. Sin embargo, el 11 de diciembre del mismo año, otro médico le aseguró a la señora Ramírez que durante la histerectomía se le había cortado el nervio motor de su pierna derecha. Los Domínguez-Ramírez adujeron que el daño así causado es permánénte y de carácter continuo, y que causa dolor, molestias e imposibilita a la señora Rodríguez moverse libremente. Alegaron que los daños fueron causados por el diagnóstico equivocado, por la “mala-práctica” médica, la violación en el deber de cuidado del paciente y la falta de supervisión en el tratamiento brindado y que los codemandados eran responsables de dichos daños. La señora Ramírez reclamó $500,000.00 en concepto de daños físicos y sufrimientos, alegando que el daño le afectaría por el resto de su vida, mientras que el señor Domínguez reclamó $300,000.00 por el daño sufrido al presenciar el sufrimiento de su esposa y por las horas invertidas en su cuido. La demanda se enmendó en dos ocasiones posteriores, para incluir como codemandantes a los hijos de Ernesto Domínguez Casuel y Migdalia Ramírez Rodríguez y para eliminar la alegación de que se había cortado el nervio motor de la pierna afectada, así como para aducir que el doctor González fue responsable por la laceración al sistema nervioso de la pierna derecha de la señora Ramírez que provocó su parálisis parcial. En la segunda demanda enmendada, se alegó que los codemandados respondían solidariamente por los daños ocasionados.
*1092 El 30 de enero de 1997, el tribunal de instancia dictó sentencia parcial por desistimiento con peijuicio a favor del Hospital. De igual forma, el 9 de febrero de 2000, también dictó sentencia parcial por desistimiento con peijuicio a favor del doctor Malaret. Por lo tanto, de los codemandados originales en el pleito, el único que permaneció como parte fue el doctor González.
Al contestar la demanda, el doctor González admitió haberle recomendado a la señora Ramírez que se realizara una histerectomía, ante el cuadro frecuente de hemorragias uterinas que ésta presentaba. Expuso que la relación médico-paciente entre ellos se mantuvo por espacio de 22 años y que en los últimos siete (7) años de dicha relación, la señora Ramírez fue objeto de cinco (5) raspes y que los últimos 2 tuvieron lugar en los 5 meses anteriores a la histerectomía. También alegó que el tratamiento que brindó a la señora Ramírez fue adecuado y de conformidad con la mejor práctica de la medicina y que la molestia o incomodidad que ésta haya sufrido fue el resultado natural de su operación y de su condición y no se debió a una actuación u omisión culposa de su médico. El doctor González alegó afirmativamente que de ser ciertos los hechos alegados por la señora Ramírez, éstos eran resultados de los actos de terceras personas por las cuales él no responde o de las actuaciones propias de la paciente al no seguir las órdenes médicas. Además, reclamó que la señora Ramírez no había mitigado daños.
El doctor González negó haber removido un coágulo de sangre de la pierna de la señora Ramírez; sin embargo, admitió que el día en que sería dada de alta del hospital tuvo que llevarla a sala de operaciones para cauterizarle unos vasos sanguíneos y vaciar un hematoma. También aceptó que las visitas post-operatorias continuaron en su oficina y que alrededor del 3 de octubre de 1992 le recomendó a la señora Ramírez que visitara al Dr. Hexor G. Cruz, cirujano plástico, para cerrar la herida, ya que ésta estaba cerrando lentamente.
El 2 de mayo de 2000, luego del trámite judicial correspondiente, durante el cual declararon las partes y sus peritos y tras examinar el expediente médico de la señora Ramírez, el foro de instancia dictó la sentencia aquí apelada, cuyas numerosas determinaciones de hechos agrupamos por temas a continuación. Es menester señalar que este caso descansa básicamente en la prueba testifical de los peritos de cada parte y el récord médico de la señora Ramírez. A base de dicho examen, los peritos formaron su opinión pericial y así la informaron al tribunal de instancia.
En cuanto a la condición fisiológica de la señora Ramírez, el tribunal determinó que durante los 22 años que duró la relación médico-paciente, la señora Ramírez realizó 81 visitas médicas documentadas y el doctor González la atendió en sus 3 alumbramientos. Concluyó que a través de los años se estableció una amistad y una relación de confianza entre las partes. La señora Ramírez confrontaba problemas de sangramiento uterino anormal, que no se pudo corregir, a pesar de las distintas medidas intentadas por el doctor González. Durante los años del período de sangramiento uterino anormal, la señora Ramírez estuvo sometida a distintos tratamientos, entre éstos, tratamiento hormonal (1976 y 1981), el uso de pastillas anticonceptivas por varios años y una operación de cuña de ovario {“wedge resection”). Ninguno de estos tratamientos corrigió el problema del sangrado uterino. El tribunal de instancia concluyó que la señora Ramírez padecía de un sangrado uterino disfuncional, que en la mayoría de los casos ocurre por problemas anovulatorios y por ello se trata hormonalmente. Sin embargo, en el caso de la señora Ramírez, el sangrado no se debía a un desbalance hormonal, puesto que su ovulación era normal, lo cual implica que el endometrio de la señora Ramírez tenía un problema funcional. El tribunal determinó que los tratamientos que se habían brindado a la señora Ramírez previo a la operación, no podían solucionar su problema, pues la prueba médica demostraba de manera contundente que no existía un desbalance hormonal. Durante el proceso, se suscitó una controversia sobre el número de raspes realizados previo a la operación. El tribunal concluyó que entre el 1981 y el 5 de junio de 1992, la señora Ramírez fue sometida a 5 raspes (4 dilataciones y curetajes del endometrio y 1 curetaje del cuello uterino). Específicamente, determinó qiie la señora Ramírez había sangrado a principios de enero del 1992, por lo cual se le hizo un raspe el 13 de enero de 1992. Menos de 5 meses después, el 5 de junio de ese mismo año, volvió a sangrar de manera irregular y se le hizo un segundo raspe. En menos de 2 semanas de este último raspe, sangró por tercera vez. Contrario a la opinión del perito de los Domínguez-Ramírez, el Dr. O. *1093 Vincent Masters, el tribunal encontró que el procedimiento se usa frecuentemente para corregir los episodios de sangrado uterino. Específicamente, indicó que la opinión del doctor Masters en el sentido de que el curetaje no sirve propósitos de tratamiento, es contraria a los señalamientos de la bibliografía médica. También determinó que en un 30% al 40% de los casos, los raspes no resuelven el problema de sangrado y éste recurre.
Sobre la histerectomía realizada a la señora Ramírez, el tribunal concluyó que ésta era la terapia indicada en las circunstancias particulares de ineficacia de los raspes y que se realizó en el momento apropiado, ya que aunque no se trataba de una emergencia, sí era urgente detener el sangrado ante el temor de que la hemoglobina de la paciente bajara demasiado. El tribunal determinó que tras el último sangrado posterior al raspe del 5 de junio de 1992, la hemoglobina de la señora Ramírez se encontraba en 11 gramos, mientras que el 23 de junio de ese año, justo antes de la histerectomía, el nivel era de 10.3 gramos. Para una persona de la condición fisiológica de la señora Ramírez, el nivel normal de hemoglobina fluctúa entre 12 y 16 gramos. Concluyó el tribunal que el tratamiento de hierro, alternativa recomendada por el perito de los demandantes para subir el nivel de la hemoglobina en la sangre, surte efecto entre los 90 a 120 días de comenzado y que dada la tendencia a la baja en hemoglobina no era razonable comenzar el tratamiento de hierro y posponer la histerectomía.
El tribunal apelado también llegó a numerosas determinaciones de hechos en cuanto al consentimiento prestado por la señora Ramírez al autorizar la histerectomía. Específicamente, determinó que el consentimiento fue informado y no dio credibilidad al testimonio del matrimonio demandante en cuanto a que el doctor González no les informó de alternativas a la histerectomía ni sobre los riesgos que el procedimiento conllevaba.
El documento de consentimiento para la histerectomía firmado por la señora Ramírez autorizaba al doctor González realizar procedimientos adicionales o diferentes al indicado en la autorización y lo autorizaba a llevar a cabo, específicamente, “todo lo que a su juicio estimase necesario o conveniente”. Al momento de firmar el consentimiento, la paciente reconoció que se le habían explicado los métodos alternativos de tratamiento, los riesgos razonablemente previsibles y los problemas de recuperación razonablemente anticipables. Por último, el tribunal determinó que el doctor González entregó el documento de consentimiento a la señora Ramírez el 17 de junio de 1992 y que ésta lo retuvo por espacio de 6 días, entregándolo en el Hospital el 23 de junio de ese año. El tribunal concluyó que el doctor González actuó al amparo de este consentimiento cuando, al observar los ovarios de la señora Ramírez y percatarse de que el izquierdo tenía un tamaño anormal en comparación con el derecho, decidió removerlo para prevenir un posible cáncer de ovario en el futuro.
El tribunal resolvió que la histerectomía no pudo haber ocasionado el daño al nervio femoral alegado por la señora Ramírez. Determinó que la tromboflebitis no es uno de los riesgos frecuentes relacionados a una histerectomía y que el riesgo de sufrirla en toda cirugía es menor al 1%. Tampoco encontró que la paciente evidenciara un cuadro pre-operatorio que la predispusiera a este riesgo. Concluyó el tribunal que la señora Ramírez sufrió un trombo en el área ilio-femoral de la pierna derecha, es decir, un poco más arriba de la rodilla. El tribunal examinó el tipo de incisión que se le practicó a la paciente y los retractores utilizados en la operación, aquilató el testimonio de los peritos de ambas partes, examinó las anotaciones en el récord médico y la bibliografía médica y encontró que la prueba había demostrado contundentemente que los retr'actores utilizados en la operación no pudieron haber causado la tromboflebitis. Concluyó que el nervio femoral se encuentra fuera del área del campo operatorio y que dado el lugar donde se colocan los retractores y hasta donde se extienden durante la histerectomía, era improbable que éstos hubieran ocasionado el daño, bien al nervio o a la vena femoral. Por lo tanto, determinó que el uso de los retractores no ocasionó daño al nervio femoral, ni durante la operación ni como efecto posterior.
El tribunal reconoció que la señora Ramírez desarrolló hinchazón e induración de la pierna derecha horas después de habérsele llevado a la Sala de Recuperación. Fue el doctor Malaret quien inicialmente diagnosticó la tromboflebitis, lo cual fue confirmado al día siguiente mediante un estudio “Doppler” que reveló que el origen del trombo era más arriba de la rodilla. El foro apelado determinó que los trombos venosos generalmente viajan de abajo hacia arriba y que el trombo en la pierna derecha de la señora Ramírez viajó desde el área ilio-femoral *1094 justo arriba de la rodilla hasta la ingle. Más aún, resolvió que aunque el trombo hubiera viajado de arriba hacia abajo, es decir, tuviera su origen en la ingle, el retractor abdominal utilizado en la histerectomía ni se acercó ni pudo comprimir dicha área. 
En cuanto al daño al nervio femoral, el tribunal de instancia concluyó que pudo haberse ocasionado por una de dos situaciones: primero, que la circulación de oxígeno al nervio femoral se viera comprometida, por estar obstruida por el trombo, como consecuencia de la tromboflebitis en el área ilio-femoral. Segundo, que los anticoagulantes administrados para combatir la tromboflebitis hubieran causado alguna lesión al nervio femoral. El tribunal consideró que esta última situación es lo que con mayor probabilidad ocurrió, de acuerdo a la literatura médica examinada.
El tribunal también aquilató los testimonios periciales de los doctores O. Vincent Masters y Carlos A. Roure, peritos médicos de los Domínguez-Ramírez y del demandado doctor González, respectivamente. Las posturas asumidas por los peritos fueron diametralmente opuestas en cuanto al diagnóstico y tratamiento brindado a la paciente.
El doctor Masters testificó que la histerectomía realizada a la señora Ramírez no estaba indicada, sino que se le debió iniciar primero en un tratamiento de hormonas, administrándosele primero pastillas anticonceptivas y luego un tratamiento hormonal por un período de 3 meses. Entendió que todo caso de sangramiento uterino disfúncional obedece a una causa anovulatoria y como tal, el tratamiento adecuado es la administración de hormonas. Específicamente, expresó que el sangramiento disfuncional de la señora Ramírez era del tipo anovulatorio. El doctor Masters indicó que además de someter a la señora Ramírez al tratamiento hormonal era necesario iniciarla en un tratamiento de hierro para aumentar el nivel de hierro en su sangre y así aumentar su nivel de hemoglobina, que se encontraba por debajo de lo normal. A tales propósitos, declaró que la histerectomía era electiva y que el someter a la señora Ramírez a este procedimiento ante el cuadro anémico que ella presentaba, constituyó negligencia por parte del doctor González Aristud. También descartó que el raspe sea tratamiento adecuado para controlar los sangrados vaginales.
Por su parte, el doctor Roure testificó que el sangrado de la señora Ramírez no era de origen hormonal, pues la patología de su útero demostró que éste ovulaba dentro de los límites normales. Además, antes de la histerectomía realizada a la señora Ramírez, ésta ya había estado en tratamiento hormonal en 2 ocasiones, había utilizado pastillas anticonceptivas y se había sometido a una operación de cuña de ovario. Esto a su juicio, evidenció la necesidad de la histerectomía como tratamiento final a los episodios de sangrado. Testificó que la histerectomía estaba indicada y que cualquier ginecólogo razonable hubiera ofrecido este remedio como tratamiento final, tratándose de una paciente con numerosos episodios de sangrados fuera de su ciclo menstrual. Aunque la histerectomía no era de emergencia, sí era urgente ante la pérdida de sangre y el nivel bajo de hemoglobina. Añadió que de no haber sido por las complicaciones post-operatorias, lo más probable era que la paciente hubiera manifestado su satisfacción con el procedimiento. También manifestó el doctor Roure que el útero de la señora Ramírez pesó entre 50 a 70 gramos más que el peso promedio de un útero normal, lo cual, en su opinión, comprueba que el padecimiento de la paciente era orgánico y que el tratamiento hormonal no hubiera resuelto su condición.
En cuanto al uso de los retractores, el doctor Masters testificó bajo la impresión de que los utilizados durante la histerectomía eran del tipo manual y a base de esto llegó a la conclusión de que éstos pudieron ser la causa del trombo sufrido por la señora Ramírez. También testificó que cuando en una cirugía ocurre una tromboflebitis, ésta necesariamente es el resultado de una actuación negligente. El tribunal no le dio crédito alguno a esta opinión, ya que el doctor Masters no ofreció elemento de juicio alguno para llegar a ella, limitándose a informar que así se señalaba en la bibliografía médica Te Linde 's, sin mayor especificidad. El Tribunal, por su parte, determinó que la tromboflebitis no es un riesgo en las cirugías, pues ocurre en menos del 1% de ellas.
*1095 En cambio, el doctor Roure explicó a satisfacción del tribunal que los retractores utilizados durante la histerectomía fueron del tipo “self-retaining”. Según el testimonio del doctor Roure, por la localización del trombo era evidente que los retractores no pudieron ocasionar la tromboflebitis. Así lo confirmó el estudio “Doppler” que se le realizó a la señora Ramírez al día siguiente de la histerectomía y en un experimento realizado por él con el objetivo de determinar si éstos podían ocasionar dicho daño. Llegó a la conclusión de que era imposible ocasionar el daño al nervio y a la vena femoral de la señora Ramírez como resultado de utilizar estos retractores. Concluyó que era especulativo aseverar que el daño al nervio femoral era resultado de utilizar este tipo de retractores en una histerectomía, ya que este nervio está fuera del campo operatorio.
En cuanto al trombo, el doctor Roure explicó que éste puede ocurrir por los disturbios propios de la cirugía sin que medie negligencia alguna. Sobre el daño al nervio femoral, el doctor Roure testificó que los anticoagulantes administrados a la señora Ramírez pudieron haber ocasionado el trombo al desarrollarse un hematoma en el músculo PSOAS, que discurre por la parte lateral de la pelvis, comprimiéndose de esta forma el nervio femoral, causando el daño al obstruirse el flujo sanguíneo en dicha área. El tribunal acogió este testimonio.
El doctor Masters testificó desconocer las razones para que a la señora Ramírez se le removiera el ovario izquierdo y la trompa de falopio. Indicó que remover estos órganos tendría el efecto de disminuir la capacidad de producir estrógeno de manera normal en la señora Ramírez. Por su parte, el doctor Roure declaró lo contrario, específicamente, que con una parte de un ovario una mujer tiene suficiente tejido para producir hormonas hasta los 52 años. Además, indicó que a los ovarios de una mujer de 45 años les queda poca vida, existiendo la probabilidad de desarrollar en éstos un cáncer que es difícil de detectar. Concluyó que podía removerse el ovario sin verse afectada la producción de hormonas. El tribunal dio entero crédito a su testimonio. El tribunal de instancia determinó que los Domínguez-Ramírez no probaron mediante preponderancia de la prueba que el tratamiento médico ofrecido no fue el tratamiento indicado y correcto y que fue éste el que con mayor probabilidad ocasionó el daño sufrido. Por el contrario, concluyó que la prueba había demostrado que el doctor González actuó dentro de las normas que regulan la buena práctica de la medicina, que la histerectomía se llevó a cabo debidamente y que posteriormente ocurrió una tromboflebitis ilio-femoral que fue atendida con anticoagulantes, lo cual provocó, a su vez, un hematoma subcutáneo en la herida que pudo haber provocado el daño al nervio femoral. El tribunal determinó que el testimonio de la señora Ramírez fue puesto en entredicho al presentarse un video tomado antes del juicio en el que ésta no demostraba las señas características de los alegados daños permanentes sufridos. El tribunal fue enfático al descartar la opinión del doctor Masters en cuanto a la necesidad de iniciar a la paciente en el uso de pastillas anticonceptivas y en un tratamiento de hierro para aumentar el nivel de la hemoglobina. También, el tribunal manifestó no tener dudas en cuanto a que la señora Ramírez hubiera expresado su satisfacción con la histerectomía realizada de no haber sido por las complicaciones postoperatorias.
El 7 de junio de 2000, los Domínguez-Ramírez presentaron la apelación de autos y señalaron 3 errores alegadamente cometidos por el tribunal de instancia al dictar la sentencia apelada. Los primeros 2 errores cuestionan la apreciación del tribunal sobre la prueba de negligencia atribuida al doctor González al realizar la histerectomía y sobre la existencia de consentimiento informado de los Domínguez-Ramírez para la extirpación del ovario izquierdo de la señora Ramírez. El tercer error cuestiona la admisión de prueba no anunciada por los demandados, específicamente el vídeo de la señora Ramírez y la utilización de esta prueba como base para desestimar la demanda. Obran en el expediente apelativo, el alegato del doctor González, la exposición narrativa estipulada de la prueba testifical y alegatos suplementarios de cada parte, por lo cual nos encontramos en posición de resolver la controversia planteada en sus méritos.
II
Discutiremos en conjunto los primeros señalamientos de los apelantes, que imputan error al tribunal de instancia al apreciar la prueba presentada. Partimos, como manda nuestro ordenamiento, de la presunción de que el médico ha ejercido un grado razonable de cuidado y que el tratamiento ofrecido fue adecuado. Rosado v. *1096 E.L.A., 108 D.P.R. 789, 791-792 (1979).
La jurisprudencia ha pautado claramente que el que un paciente sufra un daño, no crea una presunción de que el médico fue negligente. Medina Vda. de López v. E.L.A., 104 D.P.R. 178 (1975); Reyes v. Phoenix Assurance Company, 100 D.P.R. 871 (1973). Por el contrario, corresponde al demandante probar, mediante preponderancia de la prueba, que el tratamiento ofrecido por el demandado, o la ausencia de proveer el tratamiento indicado y correcto, fue el factor que con mayor probabilidad causó el daño. Blás Toledo v. Hosp. Nuestra Señora de la Guadalupe, Op. de 30 de junio de 1998, 98 JTS 101, Rodríguez Crespo v. Hernández, 121 D.P.R. 639, 650 (1988); Ríos Ruiz v. Mark, 119 D.P.R. 816, 821 (1987); Cruz v. Centro Médico de P.R., 113 D.P.R. 719, 744 (1983); Zambrana v. Hospital Santo Asilo de Damas, 109 D.P.R. 517, 521 (1980). Ello está a tono con el reconocimiento de la amplia latitud que tiene el médico para ejercer su juicio profesional en el diagnóstico y tratamiento del paciente y con la presunción de adecuacidad del tratamiento administrado. Martí Méndez v. Dr. Abréu Freshold, 143 D.P.R. 520, 527 (1997); Ramos, Escobales v. García, González, 134 D.P.R. 969, 975 (1993); Ramos Orengo v. La Capital, 88 D.P.R. 315, 328 (1963); Sáez v. Municipio de Ponce, 84 D.P.R. 535, 543 (1962). Por otra parte, siempre será necesario establecer el nexo causal entre la supuesta negligencia y el daño sufrido por el paciente para poder reclamar bajo el Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. § 5141. Dicho nexo no podrá establecerse basándose en especulaciones o conjeturas. Blás Toledo v. Hosp. Guadalupe, supra; Rodríguez Crespo v. Fernández, 121 D.P.R. 639, 650 (1988).
En definitiva, no puede imputarse negligencia a un médico si no media prueba sobre las normas mínimas de conocimiento y cuidado médico que satisfagan las exigencias reconocidas por la profesión y la relación causal entre la actuación u omisión del médico y el daño sufrido. Ramos, Escóbales v. García, González, 134 D.P.R. 969, 975 (1993); Castro Ortiz v. Municipio de Carolina, 134 D.P.R. 783, 793 (1993); Medina Santiago v. Vélez, 120 D.P.R. 380, 385 (1988).
Bajo el Art. 1802 del Código Civil, supra, la culpa o negligencia consiste en la omisión de la diligencia exigible, mediante cuyo empleo podría haberse evitado el daño. La diligencia exigible es la que cabe esperar del ser humano medio, el buen pater familias, el hombre prudente y razonable. Zambrana v. Hosp. Santo Asilo de Damas, supra. Si el daño es previsible por éste, hay responsabilidad; por el contrario, si no es previsible, se trata generalmente de un caso fortuito. Toro Aponte v. E.L.A, supra.
En principio, la capacidad del individuo para prestar consentimiento se rige por las reglas generales del Código Civil. Ello supone, pues, que para que el consentimiento del paciente sea emitido libre y conscientemente, debe estar exento de vicios que afecten su voluntad. En el ámbito de la medicina, esto implica que para validar la intervención médica con el cuerpo del paciente, debe haber consentido previamente y de manera informada. Es decir, debe haberse obtenido previamente su consentimiento informado. Torres v. Hospital Susoni, 95 D.P.R. 867, 873 (1968); Montes v. F.S.E., 87 D.P.R. 199, 203 (1963); Rojas v. Maldonado, 68 D.P.R. 818, 826 (1948); Rodríguez Crespo v. Fernández, supra.
En nuestra jurisdicción se ha adoptado el criterio del “'profesional de la medicina” en contraposición al del “paciente razonable” como la norma a seguir en cuanto a la clase de información que el médico debe comunicar al paciente. Sepúlveda de Arrieta v. Barreto Domínguez, 137 D.P.R. 735, 752 (1994). En términos generales, el médico debe informar sobre el diagnóstico, la naturaleza de las alternativas de tratamiento (especialmente del que se propone o recomienda), las probabilidades de éxito del tratamiento, sus riesgos y beneficios y la prognosis si no se trata la condición diagnosticada, información que deberá estar matizada por lo establecido en la práctica prevaleciente de la medicina en el contexto de las circunstancias particulares de cada caso. El testimonio pericial del demandante que alegue ausencia de consentimiento informado, deberá establecer que (1) un profesional médico razonable, siguiendo criterios prevalecientes en la práctica de la profesión, situado en circunstancias similares hubiera divulgado la información; y (2) que el demandado no cumplió ese criterio profesional prevaleciente. Sepúlveda de Arrieta v. Barreto Domínguez, supra, a las págs. 743-744. Además, para probar que el médico tiene la obligación de resarcirle en daños, deberá demostrar que *1097 efectivamente el paciente sufrió un daño, y que éste fue causado por el incumplimiento del médico de su deber de informar. Sepúlveda de Arrieta v. Barreto Domínguez, supra, a la pág. 755.
En el análisis final, el deber del facultativo médico de indemnizar a su paciente por los daños sufridos por éste por la ausencia de consentimiento informado, queda condicionado a que el paciente demuestre la existencia de relación causal entre el daño y la omisión de acuerdo a los preceptos que informan la causalidad adecuada. Sociedad Legal de Gananciales v. Jerónimo Corporation, 103 D.P.R. 127, 134 (1974). Conforme a ella, no es causa toda condición sin la cual no se hubiera producido el resultado, sino aquélla que ordinariamente lo produce según la experiencia general. Así pues, es necesario determinar si la materialización del daño era de esperarse en el curso normal de los acontecimientos o si, por el contrario, queda fuera de ese posible cálculo. Id, citando a Santos Briz, J., Derecho de Daños, Ed. Revista de Derecho Privado, Madrid, 1963, pág. 215.
Además, es norma trillada en nuestro ordenamiento que cuando en una acción por daños y perjuicios el reclamante alega que el médico que lo trató incurrió en impericia profesional, por no haberle informado los peligros incidentales del tratamiento que administró, tiene que establecer de conformidad con los principios generales de negligencia que la falta de información fue la causa próxima del daño resultante. Rodríguez Crespo v. Hernández, supra, a las págs. 665-666. También, el demandante tendrá que probar las normas de consentimiento informado aplicables al caso y la razón para que el médico no cumpliera con ellas. Rodríguez Crespo v. Hernández, supra, a la pág. 666.
Por último, debemos recordar que si bien los tribunales apelativos nos encontramos en la misma posición que los tribunales de instancia respecto a la apreciación de la prueba pericial y documental, no debemos intervenir con las determinaciones de hechos del Tribunal de Primera Instancia en ausencia de error manifiesto, pasión, prejuicio o parcialidad. Martí Méndez v. Abréu Freshold, supra, a la pág. 527; Rolón v. Charlie Car Rental Inc., Op. de 2 de junio de 1999, 99 JTS 89; López Vicil v. ITT Intermedia, Inc., 143 D.P.R. 574, 584 (1997); Quiñones López v. Manzano Pozas, 141 D.P.R. 139, 178 (1996).
III
Al aplicar al caso de autos los preceptos legales y jurisprudenciales señalados anteriormente, concluimos que los Domínguez-Ramírez no rebatieron la presunción que existe a favor del doctor González Aristud. No surge del expediente apelativo que la prueba presentada por los Domínguez-Ramírez satisficiera el quántum de preponderancia de la prueba requerido por nuestro ordenamiento para demostrar que la alegada negligencia imputada en el diagnóstico y tratamiento brindado por el doctor González fue el factor que con mayor probabilidad le causó el alegado daño permanente a la señora Ramírez. En vez, a base de la prueba presentada, el foro apelado determinó correctamente que no hay causalidad adecuada entre el alegado daño de la señora Ramírez y las alegadas actuaciones u omisiones imputadas al doctor González.
Para llegar a la determinación de que la prueba no estableció negligencia médica, el tribunal tuvo ante sí prueba documental consistente del récord médico de la paciente y abundante prueba testifical y pericial. Así pues, la contención de los Domínguez-Ramírez, expuesta a través de su perito, el Dr. O. Vincent Masters, de que la paciente sufrió una tromboflebitis en su pierna derecha producto de la negligencia del doctor González al realizar la histerectomía, no derrotó la prueba desfilada sobre la falta de relación causal entre la intervención de éste y el daño alegado.
El testimonio del doctor Roure, perito del doctor González, a quien el Tribunal de Instancia le dio completo y entero crédito, estableció claramente que, desde el punto de vista de la causalidad adecuada, el alegado daño no tuvo relación alguna con el tratamiento que se dio o dejó de dar a la paciente mientras era sometida a la intervención quirúrgica. Un análisis cuidadoso de la transcripción de evidencia revela que los Domínguez-Ramírez no aportaron la evidencia necesaria para establecer la negligencia imputada, ni que ésta fuese el factor que con mayor probabilidad causó el daño alegadamente sufrido. El testimonio pericial aportado por el doctor Roure, así como el expediente médico de la paciente, demuestran primordialmente que, ante el cuadro de *1098 síntomas presentado por ella, el desenlace del caso fue producto de caso fortuito y no se debió a un error de juicio en el diagnóstico y tratamiento que justifique imponerle responsabilidad al médico demandado.
Por otra parte, concluimos que se prestó el consentimiento informado para realizar la histerectomía y la salpingooferectomía. Al igual que el tribunal de primera instancia, no damos crédito a la versión de los Domínguez-Ramírez de que el doctor González no les informó sobre tratamientos alternativos a la histerectomía. Por 22 años, el doctor González fue el médico que atendió a la señora Ramírez, inclusive asistiéndola en el alumbramiento de cada uno de sus 3 hijos. Fue el médico que le recomendó el uso de pastillas anticonceptivas, le administró tratamiento hormonal en 2 ocasiones y le hizo la operación de cuña de ovario (“wedge resection”). En fin, es el médico que la trató desde que ella tenía 18 años hasta cumplidos sus 40. En este contexto, no resulta irrazonable la interpretación que dio el tribunal a la autorización que los Domínguez-Ramírez firmaron tras tener el documento en su poder durante seis días.
El diagnóstico realizado por el doctor González antes de la histerectomía, fue confirmado por la patología del útero que demostró que dicho órgano pesaba 130 gramos, mientras que la prueba demostró que el peso promedio de un útero es entre 60 y 80 gramos. Este hecho evidencia que el útero padecía de una condición orgánica, lo cual, enmarcado dentro de un cuadro clínico que evidenciaba que la señora Ramírez ovulaba y que no respondía a tratamiento hormonal ni a otros tratamientos, como los raspes, indica que tampoco es irrazonable la determinación del tribunal de que el sangrado uterino, clasificado como disfuncional, era producto de dicha anomalía.
Con respecto a la salpingooforectomía, la prueba demostró que no era previsible que al realizar el procedimiento el doctor González se encontrara con el hecho de que el ovario izquierdo fuera más grande que el derecho y tuviera que ser removido. Según la prueba pericial, dicho procedimiento está avalado como medida preventiva al cáncer de ovario y reduce la probabilidad de padecerlo. Además, la señora Ramírez consintió a este procedimiento al firmar el documento que retuvo para sí por 6 días y que entregó en el Hospital al momento de la admisión. En él prestó su autorización para que se le practicase todo otro proceso adicional o diferente a la histerectomía que fuese producto de condiciones o situaciones no conocidas o imprevistas al momento de consentir por escrito a la histerectomía. Una vez expuesto el campo operatorio, es que el doctor González se percata del tamaño agrandado del ovario izquierdo y decide extirparlo. No se da en el vacío esta decisión, pues ya la señora Ramírez tenía su núcleo familiar completo, su esposo se había realizado una vasectomía y ella había tomado pastillas anticonceptivas para prevenir embarazos, admitiendo que dejó de tomarlas, una vez su esposo se operó. La decisión de extirpar el ovario en nada afectó el funcionamiento hormonal de la señora Ramírez, pues la bibliografía médica indica que un sólo ovario produce el estrógeno requerido para una mujer de su edad.
Ante las circunstancias y testimonios expuestos ante el foro apelado, resulta ineludible concluir que el Tribunal de Primera Instancia no erró al apreciar la prueba y, por lo tanto, al desestimar la demanda. Sabemos que en ausencia de una demostración de pasión, prejuicio, parcialidad o error manifiesto en la apreciación de la prueba, este Tribunal no intervendrá con la determinación del foro de instancia. López Vicil v. I.T.T. Intermedia Inc., supra; Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49, 63 (1991); Pueblo v. Pellot Pérez, 121 D.P.R. 791, 806 (1988). Un análisis detenido y desapasionado del conjunto de la prueba presentada, nos obliga concluir que están sustentadas en la prueba las determinaciones de hechos del Tribunal de Primera Instancia y a confirmar la sentencia apelada.
IV
Por último, los Domínguez-Ramírez señalaron que el tribunal de instancia erró al admitir como prueba de refutación un video tomado a la señora Ramírez. Aducen que éste constituyó prueba sorpresiva e inadmisible y que fue impropio utilizarla como prueba directa para la exclusión de los daños reclamados.
La Regla 18(B) de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 18(B), define evidencia pertinente como “[ajquella tendente a hacer la existencia de un hecho más probable o menos probable de lo que sería sin tail evidencia”. A su vez, dicho hecho debe referirse a una cuestión en controversia o a la credibilidad de algún testigo *1099 o declarante. La razón principal que inspira la Regla 18 es limitar el ámbito de la presentación de la prueba en una forma razonable para que, primero, no se pierda tiempo presentando evidencia que no guarda relación con los hechos importantes o no está relacionada a la controversia y a la credibilidad de los testigos y, segundo, para evitar que la presentación de dicha prueba distraiga al juzgador de los hechos esenciales que debe considerar para la rápida y justa solución del litigio. Emmanuelli Jiménez, Rolando, Prontuario de Derecho Probatorio Puertorriqueño, Ed. Corripio C. Por A., Santo Domingo, (1994).
Ahora bien, es cierto que la pertinencia de la prueba no es todo lo que hay que considerar para determinar su admisibilidad. La Regla 19 de las de Evidencia dispone que la evidencia pertinente no será admisible, es decir, será excluida, cuando su valor probatorio tiene poco significado, frente a factores, tales como el peligro de causar perjuicio indebido, la probabilidad de causar confusión, la dilación en los procedimientos. También debe excluirse cuando constituye presentación innecesaria de prueba acumulativa. 32 L.P.R.A. Ap. IV, R. 19.
El propósito para el cual se presenta una prueba, también guarda relación con su admisibilidad. En lo que nos concierne, la Regla 44 de las de Evidencia permite impugnar la credibilidad de un testigo “mediante cualquier evidencia pertinente al asunto de su credibilidad'’. 32 L.P.R.A Ap. IV, R. 44. Corolario de esto, es la impugnación por contradicción. Esta persigue atacar instancias específicas del testimonio del declarante y busca demostrar, contradiciendo lo testificado, que algo de lo vertido en el juicio es falso, inexacto, poco preciso o erróneo. Pueblo v. Galindo, 129 D.P.R. 627, 642-43 (1991). Claro está, que la prueba contradictoria podrá ser excluida por razones relacionadas con su valor probatorio, de conformidad con la Regla 19, supra, y que no podrá utilizarse como subterfugio para traer prueba a todas luces inadmisible bajo otras disposiciones del ordenamiento probatorio. Pueblo v. Galindo, supra, a la pág. 645.
De igual forma, la Regla 4 de las de Evidencia, 32 L.P.R.A Ap. IV, R. 4, regula el efecto del error en la admisión de evidencia. En lo pertinente, la Regla dispone que no se dejará sin efecto la determinación de admisibilidad de alguna prueba ni tampoco se revocará una sentencia por motivo de la admisión errónea de evidencia, a menos que se admitiera mediando la oportuna y correcta objeción, siempre que dicha admisión fuera factor decisivo o sustancial en la sentencia o decisión cuya revocación se solicita. En Pueblo v. Ruiz Bosch, 127 D.P.R. 762 (1991), el Tribunal Supremo examinó el alcance de la Regla 4, supra, y fue enfático al establecer que el tribunal apelativo está obligado a considerar el efecto de la admisión de la prueba en la decisión apelada. Se considera que una prueba admitida constituye un factor decisivo o sustancial si “ésta pudo haber tenido una influencia, notable y determinante, en el veredicto, fallo, o sentencia que emitiera el juzgador de los hechos en el caso ante su consideración, fuera éste civil o criminal”. Pueblo v. Ruiz Bosch, supra, a las págs. 786-787.
Al examinar la actuación del foro apelado dentro del radio de acción de nuestro ordenamiento probatorio, resolvemos que aun si consideráramos que incurrió en error el tribunal al admitir la prueba de refutación presentada por el Dr. González, dicha admisión no afectó el veredicto rendido, pues el tribunal de instancia exoneró de responsabilidad al médico demandado a base de la credibilidad que le mereció cada uno de los peritos de las partes.
Se ha resuelto reiteradamente que en ausencia de error manifiesto, prejuicio, parcialidad o pasión, no existe fundamento en derecho para intervenir con las determinaciones fácticas del tribunal de instancia. Pueblo v. López Pérez, 106 D.P.R. 584, 587 (1977). Los Domínguez-Ramírez no imputaron al tribunal de instancia haber incurrido en lo anterior ni hay indicio alguno de ello en el presente caso.
V
Por los fundamentos anteriormente expuestos, se confirma la sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de San Juan, y, de conformidad con la Regla 85 (A) de nuestro Reglamento, le imponemos a los Domínguez-Ramírez el pago de las costas del litigio apelativo.
Lo acordó y manda el Tribunal y lo certifica la Secretaria General.
*1100 Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 2002 DTA 67
1. El tribunal de instancia definió el sangrado uterino disfuncional como “un complejo de síntomas que incluye cualquier sangrado uterino anormal, en ausencia de embolia, tumores e infección; es un sangrado que usualmente resulta de un problema intrauterino”. También se define como “ un sangrado del endometrio no relacionado a lesiones anatómicas del útero”.
2. El apartado 2 del consentimiento dispone lo siguiente: “Reconozco que durante el curso de la operación o procedimiento pueden surgir condiciones o situaciones imprevistas, incluyendo aquéllas no conocidas al momento de comenzar la operación o procedimiento, las cuales pueden requerir procedimientos adicionales o diferentes a los arriba indicados. Por la presente solicito y autorizo a todos y cada uno de ellos para que realicen todo lo que a su juicio estimen necesario o conveniente, incluyendo la administración de sangre o productos sanguíneos".
3. El apartado 3 del consentimiento específicamente dispone que: “Me han sido ampliamente explicados la naturaleza, objeto y propósito de la operación o procedimiento, los métodos alternativos de tratamiento, los riesgos envueltos que son razonablemente previsibles, la posibilidad de complicaciones, y los problemas de recuperación, razonablemente anticipables, así como el pronóstico si no consintiera a que se realice la operación o procedimiento recomendado. Reconozco que no se me ha ofrecido garantía o seguridad en cuanto a los resultados que puedan obtenerse de dicha operación o procedimiento y que no todos los riesgos y consecuencias asociados con éste pueden ser previstos o anticipados".
4. El tribunal concluyó que, generalmente, la tromboflebitis se debe a un vaso sanguíneo que ha sufrido un daño, entre otras causas por venas varicosas, por diabetes, arteriosclerosis, por accidentes previos, o por éxtasis. '
5. Los retractores utilizados en la histerectomía fueron el tipo O'Connor Sullivan. Estos retractores son del tipo “self-retaining” y sirven para visualizar el campo operatorio separando las paredes abdominales hacia arriba y abajo y hacia los lados extendiendo de forma circular la piel, la grasa, la fascia y el peritoneo.
6. El tribunal también aquilató prueba de otras posibles causas para la tromboflebitis de la señora Ramírez. Específicamente recibió prueba de que la señora Ramírez presentaba problemas en su espalda desde que sufrió un accidente automovilístico años antes de la histerectomía. El tribunal consideró que a raíz de dicho accidente, la pared de la vena femoral pudo haberse afectado, aumentado la predisposición a que ocurriera un trombo. También, consideró el hecho de que las pastillas anticonceptivas altas en estrógeno aumentan el riesgo de tromboflebitis en mujeres mayores de 35 años, aunque que la señora Ramírez había dejado de utilizarlas hacía ya muchos años. Por último, reconoció que las personas que están encamadas se encuentran propensas a sufrir un trombo.
7. Mattingly, Richard F., Thompson, John D., Te Linde's, Operative Gynecology, 6th. Ed., J.B. Lippincott Company, Philadelphia, (1985).
8. Literalmente, la Regia 19 lee: “No se dejará sin efecto una determinación de admisión de evidencia ni se revocará sentencia o decisión alguna por motivo de admisión errónea de evidencia, a menos que: 1) la evidencia fue erróneamente admitida, a pesar de Ip oportuna y correcta objeción de la parte perjudicada por la admisión, y 2) el tribunal que considera el efecto de la admisión errónea, entiende que ésta fue factor decisivo o sustancial en la sentencia o decisión cuya revocación se solicita”.