Ramírez Nazario, Juez Ponente
*868 TEXTO COMPLETO DE LA SENTENCIA
Comparece la señora María I. Viruet Morales y su esposo el señor Ercilio Burgos Ramos (los apelantes) para solicitar la revocación de la Sentencia emitida el 30 de junio de 2006 y notificada el 14 de julio de igual año por el Tribunal de Primera Instancia, Sala de San Juan (TPI). Mediante la aludida Sentencia, el TPI desestimó la demanda por daños y perjuicios presentada por los apelantes contra el Dr. Virgilio Brunet *869 Cardona.
Considerados los escritos de las partes y los documentos que los acompañan, con el beneficio de la Trascripción de la Prueba, a la luz del derecho aplicable, resolvemos confirmar la Sentencia apelada.
I
Surge de los autos que la señora María I. Viruet (señora Viruet) es una ama de casa, de aproximadamente 61 años de edad, casada con el señor Ercilio Burgos. Se desprende además que ésta curso estudios a nivel superior, pero que no concluyó el cuarto año.
El Dr. Brunet es un médico autorizado a ejercer la práctica de medicina en Puerto Rico desde 1980. Tiene especialidad en cirugía del Hospital de Veteranos, con entrenamiento en cirugía laparoscópica tomado en el año 1991. Al momento de atender a la señora Viruet había realizado múltiples remociones de vesícula mediante este procedimiento.
Según surge de autos, previo a los hechos pertinentes al caso que nos ocupa, la señora Viruet padecía de una condición de la espalda por la cual fue incapacitada físicamente en el año 1996. Para tal condición, la señora Viruet tomaba medicamentos anti-inflamatorios no esferoidales, como el Motrin. Como consecuencia de esa condición física fue diagnosticada con una depresión, por la cual se le concedió una incapacidad total por el Seguro Social Federal. Surge además que anteriormente se había practicado una esterilización y una apendectomía.
Para la fecha de los hechos, la señora Viruet padecía de dolor en el abdomen, por lo que su médico primario le refirió para que se realizara un sonograma. La señora Viruet se efectuó el sonograma en el Centro de Diagnóstico y Tratamiento de Carolina. El médico internista que allí la atendió interpretó los resultados del sonograma como indicativos de la presencia de piedras en la vesícula, por lo que la refirió al cirujano, Dr. Virgilio Brunet (Dr. Brunet).
El Dr. Brunet evaluó a la señora Viruet en el CDT de Carolina, tomando en consideración las placas y pruebas médicas que allí le habían realizado. Tras ello, recomendó a la señora Viruet que se sometiera a una operación para removerle la vesícula. Le sugirió que tal intervención se hiciera mediante una laparoscopía, ya que era el método menos invasivo y de recuperación más inmediata. El Dr. Brunet le explicó el procedimiento en términos generales y ella estuvo de acuerdo en que la intervención se realizara utilizando el mismo.
Así las cosas, la intervención fue pautada para el 19 de abril de 1999 en el Hospital del Maestro. Previo al procedimiento, la señora Viruet recibió un documento del Hospital con información sobre su consentimiento para la intervención. La señora Viruet ha indicado que firmó el documento sin leerlo. Se desprende de los autos-que antes de proceder con la laparoscopía, el Dr. Brunet ordenó que la señora Viruet se practicara una placa del área del pecho, un electrocardiograma, así como pruebas de sangre y un panel metabólico. Luego le efectuó el mencionado procedimiento de laparascopía.
Concluida la intervención, la señora Viruet fue llevada al área de recuperación. Según surge del expediente médico, la intervención se realizó sin complicaciones. Al otro día, o primer día post-operación, el Dr. Brunet evaluó a la señora Viruet. Ese día, ésta le indicó que le dolía el hombro. El Dr. Brunet le diagnosticó que se trataba de una neuritis del nervio frénico como consecuencia de la toxicidad del bióxido de carbono que se le inyecta al paciente, como parte del procedimiento de laparoscopía, con el objetivo de separar los órganos. Condición que ocurre en el 7% de las intervenciones de este tipo.
El segundo día después de la laparoscopía, el Dr. Brunet evaluó nuevamente a la señora Viruet, quien le informó que tenía dolor de cabeza. Por tal razón, éste desistió de su intención de darle de alta. El tercer día, el *870 Dr. Brunet encontró que la señora Viruet tenía el abdomen distendido, fiebre, nausea y vómitos. En vista de ello, ordenó que se le realizara un hemograma, un panel metabólico, estudios de lipasa y amilasa, una placa de pecho y un sonograma abdominal. De igual forma, ordenó que le suministraran antibiótico intravenoso.
Al otro día, cuarto día después de la laparoscopía, el Dr. Brunet halló que la señora Viruet presentaba el abdomen menos distendido, pues había evacuado. Entonces procedió a realizarle un estudio abdominal Upper GI Series. Este estudio reveló una colección sub-hepática y sub-frénica en la cavidad abdominal. El radiólogo que realizó el estudio opinó que éste reflejaba una úlcera perforada. Como consecuencia de los hallazgos, el Dr. Brunet indicó a la señora Viruet sobre la necesidad de realizar una operación exploratoria inmediatamente.
Al efectuar la cirugía, el Dr. Brunet encontró que en efecto había una úlcera perforada en el duodeno. Al identificar el problema, el médico procedió a reparar la úlcera y drenar el líquido contenido en la cavidad abdominal. Surge del expediente que tal procedimiento transcurrió sin complicaciones. La señora Viruet fue trasladada al área de cuidado intensivo para su recuperación post-operatoria.
Posteriormente, la señora Viruet desarrolló una atelectasia o efusión pleural y se le halló aire en los pulmones. Como consecuencia, estuvo hospitalizada por 26 días. Luego, tres meses después de haber sido dada de alta, a la señora Viruet se le desarrolló una hernia en la pared abdominal de la incisión. La señora Viruet acudió para ser examinada por el Dr. Brunet, quien le indicó que ese tipo de hernia es consecuencia de la infección ocurrida luego de la perforación del duodéno. El 12 de diciembre de 1999, el Dr. Brunet admitió a la señora Viruet al Doctor’s Hospital para operarle la hernia, tras explicarle el procedimiento y ésta consentir a la cirugía.
Luego de todo lo anterior, la señora Viruet y su esposo presentaron una demanda por daños y peijuicios contra el Dr. Brunet. Alegaron que éste había incurrido en impericia médica en el procedimiento de laparoscopía que le realizara a la señora Viruet. Señaló además, que fue sometida al procedimiento sin obtener un consentimiento informado. Adujo, también, que el médico le había perforado el duodeno, lo que provocó que tuviera que ser operada nuevamente, lo que posteriormente le ocasionó una hernia y ameritó otra intervención quirúrgica. Añadió que por lo fea de la herida resultante quedó mutilada, razón por la que su esposo la rechaza y por lo que su relación de pareja ha terminado. Así, reclamaron daños físicos y emocionales para los cuales solicitaron una indemnización de un millón de dólares.
Finalizados los trámites procesales pertinentes, el juicio en su fondo se llevó a cabo en septiembre de 2006. Como perito de los apelantes declaró el Dr. José Arturo Silvagnoli Collazo (Dr. Silvagnoli), pediatra. Como perito del Dr. Brunet testificó el Dr. Jorge Noya Monagas (Dr. Noya), cirujano general con entrenamiento en laparoscopía.
El 30 de junio de 2006, el TPI emitió la Sentencia apelada. Concluyó tras aquilatar la prueba, que los apelantes no establecieron que el Dr. Brunet hubiera incurrido en impericia médica, por lo que desestimó la demanda.
II
Inconforme, los apelantes acuden ante nos y señalan como errores:

“Erró el Tribunal de Primera Instancia en la apreciación de la prueba al no considerar el testimonio del Dr. Jorge Noya Monagas, perito del propio demandado y donde [sic] claramente indica que la Sra. Viruet no tenía úlcera perforada según alega el Dr. Brunet.

Erró el Tribunal de Primera Instancia al ni siquiera hacer mención de lo declarado por el Dr. Noya Monagas en la sentencia, dando entera credibilidad al testimonio del perito del demandando exclusivamente

*871
para lo que aporta a su defensa, pero no a lo [que] perjudica o destruye la misma. ”

III
Según se conoce en nuestra jurisdicción, la responsabilidad civil resultante de actos u omisiones culposas o negligentes está regida por el Artículo 1802 del Código Civil, 31 L.P.R.A. see. 5141. Dicho precepto establece que el que por acción u omisión cause daño a otro, mediante culpa o negligencia, viene obligado a reparar el daño causado. El Tribunal Supremo de Puerto Rico ha aclarado que para que exista responsabilidad bajo dicho precepto es necesario que concurran los siguientes elementos: (1) un daño, (2) una acción u omisión negligente, y (3) la relación causal entre el daño y la conducta culposa o negligente. Pons v. Engebretson, 160 D.P.R. _ (2003), 2003 J.T.S. 151; Montalvo v. Cruz, 144 D.P.R. 748 (1998); Toro Aponte v. E.L.A., 142 D.P.R. 464 (1997); Elba A.B.M. v. U.P.R., 125 D.P.R. 294 (1990).
La culpa o negligencia consiste en la omisión de aquella diligencia que exija la naturaleza de la obligación. Tal diligencia corresponde a las circunstancias de las personas, del tiempo y del lugar. La diligéñeia exigible en estos casos es la que correspondería ejercitar a un buen padre de familia o un hombre prudente y razonable. Toro Aponte v. E.L.A, supra; Elba A.B.M. v. U.P.R., supra.
La culpa o negligencia es la falta del debido cuidado, es decir, el no anticipar y prever las consecuencias racionales de un acto u omisión, que una persona prudente y razonable hubiera previsto en las mismas circunstancias. Para determinar la previsibilidad del daño, no es necesario que se haya anticipado el mismo en la forma precisa en que ocurrió, pues basta con que el daño ocasionado sea la consecuencia natural y probable del acto u omisión. Montalvo Feliciano v. Cruz Concepción, supra.
En nuestro ordenamiento rige la teoría de causalidad adecuada para determinar responsabilidad por los daños bajo el citado Artículo 1802. Según dicha doctrina, “no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general”, Montalvo v. Cruz, supra; Soc. de Gananciales v. Jerónimo Corp., 103 D.P.R. 127 (1974).
Ahora bien, la mera existencia de una acción u omisión negligente no le confiere a la demandante una causa de acción para pedir resarcimiento. La acción instada al amparo de la responsabilidad civil médica, como cualquier otra que se inicie al amparo del Artículo 1802 del Código Civil, supra, tiene un carácter estrictamente reparador y existe sólo si el acto negligente del demandado ocasionó un daño real. La reparación del daño sufrido existe sólo como medida del daño sufrido y no del grado de descuido o negligencia del demandado. Soto Cabral v. E.L.A., 138 D.P.R. 298, 309 (1995).
Con relación a los casos de daños y peijuicios por impericia médica, se resolvió en Lebrón v. Díaz, Opinión de 14 de septiembre de 2005, 165 D.P.R. _, 2005 J.T.S. 135, a la pág. 177, que para establecer los elementos de esa causa de acción es necesario “que se presente prueba satisfactoria sobre: (1) las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o especialistas; y (2) la relación causal entre la actuación u omisión del médico y la lesión sufrida por el paciente.” Véanse, además, López y otros v. Dr. Cañizares, Opinión de 5 de octubre de 2004, 163 D.P.R. _, 2004 J.T.S. 165; Soto Cabral v. E.L.A., supra, 308-309 (1995).
En cuanto al grado de diligencia que deben observar los profesionales de la salud, el Tribunal Supremo ha establecido que están obligados a seguir las normas mínimas de cuidado, conocimiento y destrezas del “profesional razonable”. El contenido de esta obligación queda delimitado conforme al estado de conocimiento y práctica prevaleciente, que satisface las exigencias generalmente reconocidas por la referida profesión, a la luz de los modernos medios de comunicación y enseñanza. Castro Ortiz v. Mun de Carolina, 134 D.P.R. 783 (1993); Medina Santiago v. Vélez, 120 D.P.R. 380 (1988); Zambrana v. Hospital Santo Asilo de Damas, 109 D. P.R. 517 (1980); Oliveros v. Abréu, 101 D.P.R. 209 (1973).
*872 Para establecer un caso prima facie contra un profesional de la salud, el demandante viene obligado a: (1) presentar prueba sobre las normas mínimas de conocimiento y cuidado aplicables al área en cuestión, (2) demostrar que el demandado incumplió con estas normas en el tratamiento del paciente, y (3) que esto fue la causa del daño sufrido por el paciente. Blás v. Hosp. Guadalupe, 146 D.P.R. 267 (1998); Santiago Otero v. Méndez, 135 D.P.R. 540 (1994); Rodríguez Crespo v. Hernández, 121 D.P.R. 639 (1988); Medina Santiago v. Vélez, supra.; Matos v. Adm. Servs. Médicos de P.R., 118 D.P.R. 567 (1987).
Existe una presunción de que un profesional de la salud ha observado un grado razonable de cuidado y atención en la administración de tratamiento y que los exámenes practicados al paciente han sido adecuados. El hecho de que un paciente haya sufrido un daño o que el tratamiento no haya tenido éxito, es insuficiente, de por sí, para derrotar dicha presunción. Corresponde a la parte demandante controvertir la presunción con prueba que demuestre algo más que la mera posibilidad de que el daño se debió al incumplimiento por paite del demandado de su obligación profesional. La relación de causalidad no puede establecerse a base de meras especulaciones o conjeturas, sino que, al igual que en todo caso civil, por preponderancia de la prueba. Si la evidencia señala a la existencia de múltiples causas del daño, no puede imponérsele responsabilidad al profesional de la salud a menos que del conjunto de la evidencia suija que con mayor probabilidad la actuación negligente fue la causa del daño. Blás v. Hosp. Guadalupe, supra; Ramos, Escobales v. García, González, 134 D.P.R. 969 (1993); Rodríguez Crespo v. Hernández, supra; Viuda de López v. E.L.A., 104 D.P.R. 178 (1975). A los médicos y otros profesionales de la salud se les reconoce una amplia discreción profesional en su trabajo. No existe responsabilidad por impericia cuando el demandado se enfrenta a una situación en la cual cabe una duda educada y razonable sobre el curso médico a seguir.
En los casos en que se alega negligencia médica en el diagnóstico,' será admisible la defensa de error de juicio si éste se produce después de que el médico hubiese efectuado esfuerzos concienzudos para enterarse y cerciorarse de los síntomas y de la condición del paciente, agotando los medios de diagnóstico que el estado de conocimiento pone a disposición de la profesión médica, y cuando las autoridades médicas reconocidas están divididas en cuanto a cuál debe ser el procedimiento de diagnóstico a seguirse. Santiago Otero v. Méndez, supra; Ramos, Escóbales v. García, González, supra; Lozada v. E.L.A., 116 D.P.R. 202 (1985); Cruz v. Centro Médico de P.R., 113 D.P.R. 719 (1983); Oliveros v. Abréu, supra. Por otro lado, ante una alegación de impericia médica en el tratamiento, procederá la defensa de error de juicio cuando existan discrepancias entre las autoridades médicas en cuanto al procedimiento terapéutico indicado en casos como el del paciente. Id.
Bajo las circunstancias de un buen juicio profesional, enmarcado dentro de los linderos de lo razonable y aceptado por amplios sectores de la profesión médica, aun aceptando que el diagnóstico o el tratamiento brindado fue erróneo, la existencia de criterios divergentes constituye defensa válida, eximente de responsabilidad, debido a la amplia discreción profesional que se le reconoce al médico. Santiago Otero v. Méndez, supra; Ramos, Escobales v. García, González, supra.
Las normas sobre impericia médica aplicables al caso de autos nos demuestran que en nuestro ordenamiento jurídico opera una presunción de que un médico ha ejercido un grado razonable de cuidado y que el tratamiento ofrecido fue uno adecuado. El hecho de que un paciente sufra un daño, no crea presunción alguna de negligencia por parte del médico. Ramos v. García, supra; Rodríguez v. Hernández, 121 D.P.R. 639 (1988); Ramos Orengo v. La Capital, 88 D.P.R. 315 (1962); Sáez v. Municipio de Ponce, 84 D.P.R. 535 (1962). El hecho de que un paciente haya sufrido un daño, el diagnóstico haya fracasado, el tratamiento ofrecido no haya tenido éxito, o no se haya provisto el tratamiento adecuado, no crean una presunción de negligencia por parte del facultativo médico. Un médico no puede garantizar un resultado favorable en toda intervención. Martí Méndez v. Abréu Freshold, 143 D.P.R. 520 (1997); Ramos Orengo v. La Capital, supra; Saéz v. Municipio de Ponce, supra. La relación causal no puede establecerse en una mera posibilidad de que el daño se debió al incumplimiento por parte del médico de su obligación profesional. Por ende, es necesario establecer un nexo causal entre la supuesta negligencia y el daño sufrido por el paciente para poder reclamar bajo al Artículo 1802 *873 del Código Civil, 31 L.P.R.A. 5141. Dicho nexo no podrá establecerse a base de especulaciones o conjeturas.
En el caso de Pérez Torres v. Bladuell Ramos, 120 D.P.R. 295, 297-298 (1988), el Tribunal Supremo expresó lo siguiente:

“Las acciones por alegada impericia médica constituyen o representan un reto especial para los jueces. Dichos casos siempre versan sobre la ocurrencia de un daño; uno que, por lo general, resulta impresionante y doloroso. No obstante el natural sentimiento de compasión que todo ser humano experimenta al enfrentarse al daño y sufrimiento de otro ser humano, los jueces tenemos que mantener siempre presente que el hecho de que haya ocurrido un daño no significa que el médico es civilmente responsable por el mismo. En otras palabras, no podemos darnos el lujo de que nuestros sentimientos dominen nuestro discernimiento. ’’

De ordinario, lo que constituye o no una práctica profesional adecuada en un caso de impericia debe ser establecido mediante testimonio pericial. Ríos Ruiz v. Mark, 119 D.P.R. 816 (1987); Reyes v. Phoenix Assurance Co., 100 D.P.R. 871 (1972); Guzmán v. Silén, 86 D.P.R. 532 (1962). Sabido es que en nuestro ordenamiento jurídico los Tribunales no están obligados a adoptar el testimonio pericial, pues tienen amplia discreción para apreciar y evaluar el mismo. Culebra Enterprises Corp. v. E.L.A., 143 D.P.R. _(1997), 97 J.T.S. 128. En la evaluación de este tipo de prueba, el tribunal apelativo está en la misma posición que el juzgador de primera instancia. Ramos, Escobales v. García, González, supra.
Ahora bien, como se sabe, la apreciación de la prueba no pericial corresponde principalmente al foro sentenciador y los tribunales apelativos sólo intervendrán con ella cuando exista error manifiesto, pasión, prejuicio o parcialidad. Lugo v. Mun. de Guayama, Opinión de 29 de octubre de 2004, 163 D.P.R._(2004), 2004 J.T.S. 171, págs. 348-349. La norma descansa en el hecho de que los foros de primera instancia están en mejor posición para evaluar la prueba desfilada, pues tienen la oportunidad de observar y escuchar a los testigos y, por ello, su apreciación merece gran respeto y deferencia. Argüello v. Argüello, Opinión de 31 de agosto de 2001, 155 D.P.R. _ (2001), 2001 J.T.S. 127. Así pues, a menos que existan circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto, y que la apreciación de la prueba se distancie de la realidad fáctica o ésta sea inherentemente imposible o increíble, el tribunal apelativo deberá abstenerse de intervenir con las determinaciones de hechos, la apreciación de la prueba y las adjudicaciones de credibilidad hechas por el juzgador de los hechos. Pueblo v. Irizarry, Opinión de 10 de mayo de 2002, 156 D.P.R. _, (2002), 2002 J.T.S. 68, pág. 1110.
En otras palabras, las determinaciones que hace el juzgador de los hechos no deben ser descartadas arbitrariamente ni tampoco deben sustituirse por el criterio del foro apelativo, a menos que de la prueba admitida surja que no existe base suficiente que apoye tal determinación. Rolón v. Charlie Car Rental, Inc., 148 D.P.R. 420 (1999); López Vicil v. I.T.T. Intermedia, Inc., 142 D.P.R. 857 (1997).
Debe advertirse, como ya mencionamos, que es un principio cardinal de derecho que este tribunal, en el ejercicio de su facultad revisora, tiene amplia discreción en la apreciación de la prueba pericial y documental ofrecida, encontrándose en la misma posición que los tribunales de primera instancia. Así puede adoptar su propio criterio en la apreciación de la prueba pericial. Ramos Robles v. García Vicario, supra. No obstante, nuestra decisión debe estar fundada en la prueba vertida en el juicio por los peritos y la prueba documental. En ausencia de prueba, no es nuestra función establecer a este nivel apelativo los elementos requeridos por el Artículo 1802 del Código Civil, supra. De lo contrario, cedemos a la tentación de sustituir el criterio de los peritos médicos por el nuestro, según un estudio apelativo de la literatura disponible. Ríos Ruiz v. Mark, supra.
La Regla 53 de Evidencia, 34 L.P.R.A. Ap. IV, R. 53, adopta una norma liberal en lo referente a la capacidad de actuar como perito. No obstante lo anterior, las cualificaciones de un perito inciden sobre el valor probatorio de su testimonio. Véase, Dye-Tex Puerto Rico, Inc. v. Royal Ins. Co. of P.R., Inc., _ D.P.R. _ *874 (2000), 2000 J.T.S. 67. La carencia de la especialidad concernida afecta el peso de la prueba pericial, pero no la cualificación del perito como tal. Id. En otras palabras, el especialista está en mejor posición respecto al valor probatorio de su opinión que un generalista.
El Tribunal Supremo en Dye Tex P.R., Inc. v. Royal Ins. Co., P.R., supra, expresó que el valor probatorio del testimonio pericial depende de varios factores, entre los que se destacan los siguientes: 1) las cualificaciones del perito; 2) la solidez de las bases de su testimonio; 3) la confiabilidad de la ciencia o técnica subyacente; y 4) la parcialidad del perito. La especialidad de un perito en cierta área puede ser decisiva en cuanto al valor probatorio de su testimonio. Asimismo, la carencia de especialidad concernida afecta el peso de la prueba pericial, pero no la cualificación. Dye Tex P.R., Inc. v. Royal Ins. Co., P.R., supra. Esto, pues la especialidad va más al valor probatorio que a la admisibilidad o cualificación pericial. Id.
En los casos de testigos médicos presentados como peritos, la cuestión de calificación es si el testigo está familiarizado con las teorías médicas que se relacionan con el problema. La práctica de una especialidad no es requisito indispensable para que pueda prestar testimonio. Pueblo v. Echevarría Rodríguez I, 128 D.P.R. 299 (1991); Pueblo v. Rodríguez Otero, 90 D.P.R. 861 (1964).
En síntesis, conforme a lo esbozado por el Tribunal Supremo, el valor probatorio de la prueba testifical depende en gran parte de las cualificaciones del perito. Aunque un generalista y un especialista cualifiquen ambos como peritos bajo la Regla 53 de las de Evidencia, supra, el especialista está en mejor posición respecto al valor probatorio de su opinión, pero ello no es factor determinante para la evaluación del testimonio pericial. Id.
IV
Por relacionarse con la apreciación de la prueba, discutiremos en conjunto los señalamientos de error, pues ambos reclaman que el tribunal no evaluó adecuadamente los testimonios periciales.
Orientados por la normativa antes expuesta, nos corresponde determinar si los apelantes presentaron prueba suficiente para rebatir la presunción que cobija a los médicos, de que éstos han brindado un grado razonable de cuidado y tratamiento adecuado a sus pacientes. Los errores señalados por los apelantes giran esencialmente en torno a la apreciación de la prueba pericial ofrecida por las partes. Por ello, como dijimos, examinaremos los mismos conjuntamente a la luz de los hechos que estimó probados el TPI luego de evaluar la prueba pericial. Los testimonios periciales surgen de la transcripción de la prueba que obra ante nos.
Es la contención de los apelantes que el TPI dio entera credibilidad al testimonio del perito del Dr. Brunet, el Dr. Noya, sólo en aquellas instancias en que éste favorecía la posición de aquél. Especificó que el TPI había errado en la apreciación de la prueba al no considerar que este perito, Dr. Noya, declaró que contrario a lo afirmado por el Dr. Brunet, la señora Viruet no tenía ninguna úlcera duodenal que fuera perforada. No nos convencen sus argumentos.
En el caso de autos, dentro del ejercicio de su sana discreción, el TPI acogió unas conclusiones periciales y rechazó otras al determinar que el Dr. Brunet no había sido negligente. En este sentido, recordemos que el juzgador de los hechos no está obligado a aceptar las conclusiones de un perito. Regla 57 de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 57; Pueblo v. Marcano Pérez, 116 D.P.R. 917 (1986).
Luego de examinar cuidadosamente el expediente ante nuestra consideración, entendemos que el TPI actuó correctamente al declarar sin lugar la demanda en daños y peijuicios instada por los apelantes. De un examen del expediente, se desprende claramente que el foro a quo le otorgó mayor valor probatorio y credibilidad al testimonio vertido por el perito del Dr. Brunet que al testimonio del perito de los apelantes. Las cualificaciones del perito Dr. Noya, cirujano general entrenado en laparoscopía y quien ha efectuado múltiples procedimientos *875 de remoción de vesícula mediante este procedimiento, contrastan marcadamente con las del Dr. Silvagnoli quien es un pediatra que nunca ha realizado una cirugía, ni ha sido entrenado para efectuar cirugías laparoscópicas. Ello, como sabemos, no lo descalifica‘como perito, pero si afecta, como ocurrió en este caso, el valor probatorio de su testimonio. Contribuye además a lo anterior que, a diferencia del Dr. Noya, el Dr. Silvagnoli no estudió el expediente médico de la señora Viruet en su totalidad.
Atendida la doctrina aplicable a los casos de impericia médica, procedemos a evaluar la alegada negligencia del Dr. Brunet. Los apelantes sostienen que el tratamiento brindado a la señora Viruet no fue adecuado, a tenor con la mejor práctica de la medicina. Señalan que su perito, Dr. Silvagnoli declaró que el Dr. Brunet probablemente había lacerado mínimamente el duodeno, pero que con el pasar de los días, la laceración aumentó y provocó la infección en el abdomen. El TPI concluyó correctamente que tal aseveración no se sostiene en la prueba desfilada. Esta afirmación del Dr. Silvagnoli no es más que una especulación o conjetura, lo cual, como sabemos, no puede ser suficiente para establecer una relación causal. Al formular su determinación, el TPI no dio valor probatorio al testimonio de este perito. Al descartarlo, destacó que el perito, Dr. Silvagnoli, reconoció que el duodeno es uno de los órganos más vasculares del cuerpo, por lo que de ser lacerado, el sangrado sería abundante. Sin embargo, éste admitió que del informe operatorio no surgía complicación alguna. Asimismo, que las pruebas de sangre efectuadas a la señora Viruet, luego de la operación, tampoco reflejaban niveles de hemoglobina bajos, lo que sería incompatible con una laceración del duodeno y el consecuente sangrado abundante. También tomó en consideración el TPI que de la explicación del proceso de la laparoscopía presentada en juicio por el Dr. Brunet y reiterada por su perito, el Dr. Noya, se concluía que resultaba físicamente imposible lacerar el duodeno, debido a la distancia considerable entre el dicho órgano y el trocar que se introduce en el abdomen para comenzar el procedimiento. Este perito declaró además que si se hubiese ocasionado una laceración leve en el duodeno, como especula el Dr. Silvagnoli, ésta se habría sanado con el transcurso del tiempo, no empeorado.
De igual forma, el TPI le restó credibilidad a lo declarado por el Dr. Silvagnoli sobre que la señora Viruet no tenía historial de úlceras. Ello así, toda vez que éste testificó que la señora Viruet padecía de problemas en la espalda para los que tomaba anti-inflamatorios no esferoidales, como el Motrin. Confrontado con la descripción farmacológica de tales medicamentos, en la cual se advierte de los riesgos de ingerirlos, reconoció que uno de los más comunes es las úlceras duodenales. De igual forma, le mereció entera credibilidad al TPI lo declarado por los Dres. Noya y Brunet en cuanto a que la falta de historial de úlcera se debía a que ésta aún no había sido detectada, y que probablemente el dolor de la señora Viruet obedecía no sólo a que tenía piedras en la vesícula, sino además a una úlcera no diagnosticada. (Transcripción de la Prueba, 9 de septiembre de 2006, pág. 45).
Ahora bien, contienden los apelantes que el Dr. Noya declaró que la señora Viruet no tenía una úlcera perforada. Los apelantes sacan fuera de contexto lo declarado por el Dr. Noya para tratar de establecer como cierto un hecho falso, que dicho galeno no determinó. Sin embargo, del estudio de la Transcripción de la Prueba surge que lo declarado por el Dr. Noya fue más bien que los síntomas iniciales de la señora Viruet, luego de la laparoscopía, no permitían concluir de inmediato que se trataba de una úlcera perforada. Por ello, entendió que el proceder del Dr. Brunet para indagar sobre tales síntomas fue correcto. (Transcripción de la Prueba Oral, 9 de septiembre de 2006, pág. 42).
Los apelantes argüyeron además que no había informe patológico de la úlcera. El TPI dio entera credibilidad a lo declarado por el Dr. Brunet en cuanto a que no había tal informe debido a que la úlcera fue reparada y no se removió tejido para enviar a patología. Esto, debido a que al ser una úlcera del duodeno, la probabilidad de ser cancerosa es extremadamente baja. (Transcripción de la prueba, 8 de septiembre de 2006, págs. 48-50 y 102-103).
En fin, el expediente ante nos refleja que, contra la abundante literatura médica sobre procedimientos quirúrgicos en el campo de la cirugía laparascópica y el contundente testimonio del Dr. Noya, con extensa *876 experiencia en este campo, así como el del propio Dr. Brunet, los apelantes descansaron en el testimonio de un médico pediatra, que no contaba con estudios especializados o experiencia en dicho campo de la medicina y que no estudió el expediente de la señora Viruet en su totalidad.
Vimos, además, que el Dr. Brunet le ordenó a la señora Viruet todas las pruebas procedentes antes de la intervención. Desde su punto de vista, los resultados de éstas y los síntomas que presentaba la señora Viruet, eran los típicos de una condición de piedras en la vesícula y la paciente no presentaba hallazgos significativos, que justificaran la realización de otras pruebas. Asimismo, vimos la diligencia del Dr. Brunet posterior a la intervención. Este médico evaluó exhaustivamente a su paciente todos los días y ordenó múltiples pruebas médicas, en atención a los síntomas que se fueron presentando día tras día. No autorizó que le dieran de alta, en vista de que la aquejaba un dolor de cabeza. Actuó de inmediato para atender ésta y todas las situaciones que se presentaron. La conclusión del TPI de que el cuidado y la diligencia desplegada por el Dr. Brunet fue la adecuada, queda fortalecida por las posteriores visitas de la señora Viruet a este médico para tratamiento adicional. Así, como haberse sometido a otra operación por éste. Es decir, la señora Viruet continuó tratándose y confiando en el juicio profesional del Dr. Brunet.
Entendemos que el testimonio del Dr. Noya estableció que el Dr. Brunet utilizó en todo momento su buen juicio profesional al tratar a la señora Viruet, siendo el tratamiento brindado cónsono con lo razonablemente aceptado por sectores de la profesión médica. El juzgador determinó que este testimonio merecía mayor valor probatorio que el prestado por el perito de los apelantes. Tal conclusión fue el producto de la credibilidad que le mereció el testimonio del cirujano, Dr. Noya, al tribunal sentenciador. Testimonio basado en una mayor preparación y experiencia en el área médica de la cirugía.
Examinados los autos, la totalidad de la prueba y en particular, la transcripción de los testimonios periciales vertidos en juicio, somos del criterio de que el Dr. Brunet, al enfrentarse a una situación como la que ocurrió en este caso, utilizó un juicio profesional razonable al diagnosticar y brindar el tratamiento conferido a la señora Viruet. Por ello, no incurrió en responsabilidad bajo el Artículo 1802 del Código Civil, supra.
Tomando en consideración las normas y los factores señalados, actuó correctamente el TPI al otorgarle mayor peso probatorio a los testimonios ofrecidos por los médicos especialistas. La teoría de negligencia esbozada por los apelantes fue rechazada por los peritos especialistas en las áreas de cirugía y laparoscopía. La prueba pericial presentada por los apelantes no pudo rebatir la presunción de adecuacidad y corrección en el tratamiento ofrecido por el Dr. Brunet. Este brindó a la señora Viruet una atención médica que satisface las exigencias generalmente reconocidas por la profesión médica.
Por otro lado, los apelantes arguyen que el Dr. Brunet no obtuvo el consentimiento informado de la señora Viruet, para que ésta pudiera escoger otras alternativas de tratamiento. Argumentan que el Dr. Brunet no le informó sobre todos los riesgos de la intervención a realizarse. Está establecido que el consentimiento de un paciente es un elemento indispensable para efectuar un procedimiento médico-quirúrgico, excepto los casos de excepciones reconocidas como las situaciones de emergencias y de perjuicio al estado sicológico del paciente. Rodríguez Crespo v. Hernández, 121 D.P.R. 639 (1988); Torres Pérez v. Hosp. Dr. Susoni, Inc., 95 D.P.R. 867 (1968); Montes v. Fondo del Seguro del Estado, 87 D.P.R. 199 (1963). Es necesario que ese consentimiento sea informado.
La doctrina del consentimiento informado impone al médico el deber de informar a su paciente acerca de la naturaleza y los riesgos de un tratamiento médico propuesto, de manera que el paciente se encuentre en la posición de hacer una decisión inteligente e informada. El médico debe revelar toda aquella información que, de acuerdo con su conocimiento y experiencia, necesitaría conocer el paciente por ser pertinente a la decisión que debe tomar- en cuanto a consentir o no a someterse al procedimiento médico propuesto.
*877 El médico tiene la obligación de divulgar al paciente los riesgos razonablemente previsibles, así como los beneficios de tratamientos y procedimientos invasivos del cuerpo humano y de las alternativas disponibles. También debe informar al paciente sobre los riesgos probables relacionados con no tratarse la condición. Los médicos tienen el deber de suministrar al paciente suficiente información sobre la naturaleza del tratamiento, los riesgos involucrados y los beneficios que se esperan. No hay obligación de divulgar riesgos remotos que hayan ocurrido en pocas ocasiones y que no es probable que ocurran en ese paciente en particular. Véase, Ríos Ruiz v. Mark, supra.
Al aplicar los criterios legales y jurisprudenciales expuestos, resolvemos, al igual que lo hizo el TPI, que en este caso, el Dr. Brunet obtuvo un consentimiento informado de la señora Viruet, luego de discutir con ella los riesgos previsibles y la conveniencia de someterse al tratamiento propuesto. Por un lado, hay que destacar que la señora Viruet firmó los documentos que se le entregaron con información sobre el procedimiento al que se sometería. Por otro lado, ella admitió que el Dr. Brunet le. orientó sobre el procedimiento, pero que no recordaba en detalle lo que le dijo. El Dr. Brunet, por su parte, declaró que la complejidad de la información que brinda a sus pacientes varía de acuerdo a su impresión sobre la capacidad de éstos para entender la información técnica que pueda conllevar tal orientación. Añadió que es imposible informar todos los riesgos de la intervención, pues los datos son muy extensos. Coincidimos con el TPI al concluir que la señora Viruet recibió una orientación razonable y suficiente para poder consentir informadamente a la intervención. Por esta razón, tampoco podía imponerse responsabilidad al Dr. Brunet.
A la luz de lo anteriormente esbozado, no intervendremos con la adjudicación de. credibilidad y la. evaluación de la prueba pericial efectuada por el TPI. El Tribunal Supremo ha reiterado que aunque se trate de prueba pericial, los foros apelativos no deben intervenir con la apreciación hecha por el foro de instancia en ausencia de pasión, prejuicio, error manifiesto o parcialidad, particularmente cuando un examen detenido del expediente del caso no produce insatisfacción de conciencia ni estremece nuestro sentido de justicia y la determinación del tribunal representa el balance más racional, justiciero y jurídico de la prueba. Rodríguez v. Nationwide Insurance, 156 D.P.R. 614 (2002).
V
Por los fundamentos expuestos, se confirma la Sentencia apelada.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
Leda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones