Norman Torres Pérez, demandante y recurrente, v. Hospital Dr. Susoni, Inc. et al., demandados y recurridos.

Número: R-64-58     Resuelto: 27 de marzo de 1968

*Rodríguez Ema & Rodríguez Ramón, Rodolfo Zequeira y Nicolás Jiménez,* abogados del recurrente; *Rivera Zayas, Rivera Cestero & Rúa, Herminio Miranda, Francisco Agrait* y *Rodolfo Cruz Contreras,* abogados de los recurridos.

Sala Primera integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Blanco Lugo, Rigau y Ramírez Bages.

El Juez Asociado Señor Ramírez Bages emitió la opinión del Tribunal.

No incidió el tribunal de instancia al desestimar la demanda del recurrente contra los recurridos donde alegaba la pérdida de una pierna por la negligencia de los recurridos al brindarle asistencia médica inadecuada, habiéndose establecido (1) que el tratamiento a que el recurrente fue sometido fue el indicado y el correcto; (2) que no hubo prueba de que la gangrena gaseosa que se desarrolló en la pierna

del recurrente, lesionada en un accidente automovilístico, se debiese al tratamiento o a las condiciones higiénicas de la clínica; (3) que su amputación era necesaria para salvarle la vida; y (4) que se obtuvo el permiso de su hermana, quien aparecía encargada del caso, para realizar la amputación del referido miembro porque a juicio del cirujano, el informarle al paciente de la necesidad de la amputación lo iba a deprimir, dado su estado emocional, y, además, porque en las circunstancias del caso era inhumano así obtener tal permiso. No se ocasionaron al recurrente los daños que reclama. Nos explicamos enseguida.

Los hechos del caso, según el tribunal de instancia los determinó, fueron los siguientes:

"1—El día 11 de noviembre de 1959, como a las 6:00 de la tarde, el demandante manejaba un vehículo de motor por la carretera de Manatí a Vega Baja, la cual se encontraba mojada, y el demandante perdió el control de su vehículo y se salió de la carretera, yendo a chocar contra un árbol, sufriendo distintas lesiones. Fue montado en otro automóvil por algunas personas que llegaron al sitio y trasladado al Hospital de Manatí. En dicho hospital no se le hizo nada y fue montado en una ambulancia y trasladado al Hospital Dr. Susoni, Inc., de Arecibo, donde llegó de 8:00 a 8:30 de la noche y fue llevado inmediatamente a la Sala de Emergencia de dicho hospital. Se le tomaron placas de Rayos X que reflejaron una dislocación en la rodilla derecha. El demandante presentaba una herida abierta como de 5 a 6 pulgadas de largo y una pulgada y pico de profundidad en la región poplítea, detrás de su rodilla derecha, con partículas de tierra y coágulos de sangre. La Dra. Miranda procedió a lavar la herida para remover las partículas de tierra y polvo con solución Physohex, y normal salina, desinfectantes, y procedió entonces a ligar los vasos sanguíneos y a remover todo el tejido grueso para eliminar los focos de una posible infección. Luego suturó la herida y redujo la dislocación en la forma usual, poniéndole entonces un yeso circular en la pierna derecha, esperando que fraguara y luego abrió el yeso en su cara anterior desde la parte superior del muslo hasta donde comienzan los dedos del pie. Se le aplicó también en la Sala de Operaciones una

primera dosis de TAT antigangrenosa para evitar el tétano y la gangrena gaseosa con instrucciones de que fuera repetida por la mañana. Además, se le puso una inyección de penicilina para evitar o compatir cualquier posible infección y un suero líquido para mantener el volumen sanguíneo normal. Se dieron órdenes de que se le pusiera demerol, el cual le fue administrado posteriormente para calmar el dolor. Durante los próximos días se siguieron todas las instrucciones y órdenes de la Dra. Miranda y era visitado regularmente por lo menos dos veces al día por distintos médicos del hospital demandado, incluyendo a los Doctores del Toro, Susoni y Rodríguez Olmo.

2—El demandante desarrolló en su pierna derecha una gangrena gaseosa de tipo infeccioso que se produce debido a la entrada de bacterias en una herida expuesta al polvo, sucio o tierra y que, de acuerdo con el conjunto de la prueba aportada, incluyendo el testimonio del único perito presentado por el demandante, se infiere que la contrajo el demandante con toda probabilidad en el sitio del accidente o durante su traslado a distintos sitios antes de ser atendido por la Dra. Miranda. Debido al desarrollo de la gangrena fue necesario que el Dr. Susoni amputara la pierna derecha al demandante el día 14 de noviembre de 1959, para salvarle la vida, ya que de otra manera hubiese continuado la infección extendiéndose por el resto del cuerpo y le hubiese causado la muerte.

3—El tratamiento suministrado al demandante por el Hospital Dr. Susoni, Inc., y por los doctores demandados era el indicado para una lesión de la naturaleza sufrida por el demandante y se utilizaron los procedimientos y técnicas indicadas por la ciencia médica y de acuerdo con la mejor práctica de la medicina moderna. Se estableció que la ciencia médica no conoce otros medios o procedimientos distintos a los usados por la parte demandada en el tratamiento de la lesión del demandante y que puedan evitar lo acontecido. No se ha establecido tampoco por el demandante que sus daños fueran causados por la falta de pericia o destreza en el tratamiento suministrádole por los demandados y por el contrario se estableció por la prueba de la parte demandada que todos los doctores demandados actuaron con la mayor destreza, pericia y celo que puede razonable y prudentemente ejercerse.

4—La parte demandante no presentó prueba alguna tendente a establecer que la gangrena gaseosa fuera causada por

un acto negligente o una omisión de la parte demandada. El demandante presentó prueba de que sentía el yeso muy apretado y de que se quejó de ello. Sin embargo, se estableció aún por el testimonio del propio perito del demandante, Dr. Lugo, que la gangrena por apretamiento se manifiesta en forma distinta a la gaseosa y que es fácil distinguir una de la otra, afirmando el doctor Lugo y todos los demás médicos de la parte demandada que definitivamente la gangrena que atacó al demandante era gaseosa o de tipo infeccioso y no por apretamiento. También se estableció por el testimonio de todo los peritos, incluyendo al Dr. Lugo, que una gangrena gaseosa puede causar en el paciente una sensación de apretamiento aún sin tener un yeso puesto ni nada que le apriete el órgano del cuerpo afectado.

Por otro lado, la prueba de la parte demandante fue sumamente contradictoria. Los testigos declararon en forma vacilante e insegura y por su forma de declarar y las contradicciones en que incurrieron el Tribunal tiene serias dudas sobre la veracidad de sus testimonios."

Basado en estos hechos, dicho tribunal desestimó la demanda.

Apunta el recurrente que el tribunal de instancia incidió:

"1. . . . al concluir que . . . 'debido al desarrollo de la gangrena fue necesario que el doctor Susoni amputara la pierna derecha el día 14 de noviembre de 1959'

.     .     .     .     .     .     .     .

2. . . . al omitir en sus Conclusiones de Hechos que el codemandado Hospital Dr. Susoni, Inc., no obtuvo el consentimiento del demandante para practicar en éste la amputación de su pierna derecha.

3. . . . al declarar sin lugar la demanda radicada en este caso, apartándose de la doctrina establecida en Puerto Rico, por las decisiones de esa Honorable Superioridad en los casos de *Rojas* v. *Maldonado*, 64 D.P.R. 818 [*sic*], y el caso de *Tomás Montes* v. *Fondo del Seguro,* opinión de fecha 31 de enero de 1963. [87 D.P.R. 199]

4. . . . al apreciar el conjunto de la prueba ofrecida durante la vista de este caso."

1. Sostiene el recurrente que la amputación de su pierna se realizó el 16 de noviembre y no el 14 como concluyó el

tribunal de instancia. No vemos como este error clerical pudo perjudicar al recurrente, error corregible a instancia del propio recurrente. *Sierra, Comisionado* v. *Nido*, 71 D.P.R. 905, 911 (1950).

2. Es cierto que el tribunal de instancia no hizo conclusión alguna sobre si se obtuvo o no el consentimiento del recurrente para realizar la amputación de su pierna derecha. Este apuntamiento carece de sustancialidad pues no tan sólo el recurrente no solicitó oportunamente que el juez sentenciador incluyese esa circunstancia en sus conclusiones de hechos sino que aún habiéndola incluido, no requería un dictamen distinto al que dicho magistrado rindió en este caso. Más adelante indicamos por qué.

3. Con respecto al consentimiento requerido para realizar la operación en cuestión, según dictaminamos en *Rojas* v. *Maldonado*, 68 D.P.R. 818 (1948), la hermana del recurrente, quien desde que llegó éste a la clínica Susoni, estuvo a su lado, atenta y solicita por su bienestar, al preguntársele qué le dijo el Dr. Susoni (el día 16 de noviembre de 1959 que fue cuando se realizó la amputación de la pierna del recurrente), testificó que:

"Yo estaba al lado de mi hermano y entonces él [el Dr. Susoni] me llevó para afuera y ahí me pararon así frente de la habitación donde él estaba y él me dijo que como yo era la encargada, que él me iba a dar una noticia, *y que había que amputarle la pierna a mi hermano.* Entonces pues, al decirme eso yo le dije: 'oh, no doctor, no puede ser'. Entonces perdí . . . . El me contestó: 'Pero no llore.' Porque yo me puse a llorar. *Y entonces él me dijo que si no se amputaba la pierna, moría. Que si yo no daba permiso, moría, porque tenía gangrena. Entonces yo le dije que él era doctor y sabía lo que tenía que hacer."* (Énfasis suplido.)

El interrogatorio del Dr. Susoni sobre esta cuestión fue el siguiente:

"P. ¿Usted le pidió autorización para amputarle la pierna, por escrito, a Norman Torres?

R. A los familiares siempre se hace.

P. A Norman Torres.

R. No recuerdo. Es una orden en vigor, que siempre se hace, y debe estar ahí el permiso en el récord.

P. ¿Firmado por él?

R. No sé si por él o por los familiares.

P. ¿Usted sabía que edad tenía él?

R. Veintiseis años.

P. ¿El no le autorizó?

R. En estos casos, por lo general, se le hace la cirugía necesaria. *Si yo le digo a un paciente*: 'Le voy a amputar su pierna', indiscutiblemente que, en su estado emocional lo voy a deprimir.

.    .    .    .    .    .    .    .

P. ¿En qué estado de gravedad tiene que estar un individuo para que usted le pida autorización, para decirle: 'Le voy a cortar la pierna'?

R. Es una práctica inhumana.

.    .    .    .    .    .    .    .

P. ¿Me puede usted decir por qué razón se le amputó la pierna a Norman Torres Pérez?

R. *Porque desarrolló una gangrena gaseosa y su estado general se deterioró y podía comprometer la vida de él. Ciertamente hubiese comprometido la vida de él si no se le amputa la pierna.*

P. De no habérsele amputado la pierna a Norman Torres, ¿que hubiese pasado?

R. *Probablemente hubiese muerto el paciente.*" (Énfasis suplido.)

El Dr. Aníbal Lugo, testigo del recurrente, al preguntársele por qué se le amputó la pierna al recurrente, contestó que "Su situación no se pudo controlar con los medios que se utilizaron y ya era una situación donde comprometía la vida de él." Añadió que: "Yo creo que a él se le hizo todo lo que se podía haber hecho para controlarla. Se le hizo drenaje, se le dio antibiótico, suero antigangrenoso. La situación fue tal, parece que fue tan masiva la situación, que siguió progresando. *Hay personas que han perdido la vida por no hacerle una amputación a tiempo.*" (Énfasis suplido.)

El Dr. Rodríguez Olmo testificó que hubo que amputar "porque la infección se hubiera generalizado y hubiese muerto como consecuencia de ello", que era cuestión de salvarle la vida.

En *Montes*, supra, dijimos que en ciertas ocasiones, como en casos de emergencia, no hace falta el consentimiento del paciente para operarle. "Por emergencia se entiende una combinación imprevista de circunstancias que requiere actuación inmediata; una necesidad es aquella que es inevitable o indispensable. Cuando ocurre una emergencia surge la necesidad inmediata de hacerle frente." *Wheeler* v. *Barker*, 208 P.2d 68 (Cal. 1949). En *Wheeler*, supra, se dijo además, que ". . . cuando un cirujano se confronta con una emergencia o una condición no anticipada y se hace necesario actual con prontitud para conservar la vida o la salud del paciente y resulta inefectivo el obtener el consentimiento para una operación que considera de necesidad inmediata, es su deber realizar lo que las circunstancias exijan dentro de la práctica usual y acostumbrada entre los médicos en la misma localidad o en otras similares y está justificado en ampliar la operación y en remover o resolver la situación sin el expreso consentimiento del paciente." Tanto en *Jackovach* v. *Yocom*, 237 N.W. 444 (Iowa 1931), como *Browning* v. *Hoffman*, 103 S.E. 484 (W. Va. 1920), se trataba de la amputación necesaria de un brazo en el primero y de una pierna en el segundo. En ambos casos, los pacientes eran niños y en ambos se trató de obtener el consentimiento de los padres pero éstos no estaban disponibles. Se resolvió que bajo esas circunstancias el consentimiento estaba implícito, y una operación de emergencia se podía realizar sin esperar el consentimiento. Véase el artículo del letrado Robert E. Powell, *"Consent to Operative Procedures"*, 21 Md. L. Rev. 189 (1961). Véanse, además, *Shelter* v. *Rochelle*, 409 P.2d 74 (Ariz. 1965); *Natanson* v. *Kline*, 350 P.2d 1093 y 354

P.2d 670 (Kan. 1960); *Bang* v. *Miller*, 88 N.W.2d 186 (Minn. 1958).

■ En el caso ante nos, el paciente era un adulto y estaba en su sano juicio cuando el Dr. Susoni solicitó el consentimiento de su hermana para realizar la referida amputación. Como se dijo en *Woods* v. *Brunlop*, 377 P.2d 520 (N.M. 1962), "otra excepción existe cuando la indicación, de todos los riesgos de un tratamiento puede muy bien resultar en alarmar al paciente que ya está aprehensivo y quien por tal motivo, puede negarse a ser operado o a recibir un tratamiento en el cual existe un riesgo mínimo o cuando suministrarle tal información puede resultar en efectivamente acrecentar el riesgo por razón de la reacción sicológica de la misma aprehensión." Véase *Hunt* v. *Bradshaw*, 88 S.E.2d 762 (N.C. 1955).

Consideradas todas las circunstancias concurrentes, y especialmente el peligro a que estaba expuesto el paciente, no se cometió el error relacionado con el consentimiento para practicar la amputación.

■ 4—Se apunta que el juez sentenciador incidió en su apreciación de la prueba. El recurrente trató de demostrar que la gangrena gaseosa que requirió la amputación de su pierna provino de que al enyesarse la pierna, ésta quedó excesivamente oprimida, al extremo de obstaculizarse la circulación. También se trató de probar que el recurrente tuvo que haber contraído la infección en el propio hospital y que su tratamiento por la Dra. Miranda fue inadecuado. La prueba sobre estos extremos fue la siguiente:

(a) Tanto el recurrente como su hermana testificaron que el pantalón que usaba cuando ocurrió el accidente era nuevo, no se ensució ni se rompió; sólo se llenó de sangre.

(b) Sin embargo, la Dra. Miranda, quien primeramente atendió al recurrente, testificó que en la herida de la pierna había tierra y que procedió a removerla con una solución salina y Physohex.

(c) Con respecto a las condiciones del hospital testificaron los Dres. Rodríguez Olmo y Susoni así:

"P. Durante esos días en que Norman Torres Pérez fue hospitalizado en la Clínica Susoni, preguntó en qué condiciones de sanidad se encontraba esa clínica.

Dr. Rodríguez Olmo:

Nuestra sala de operaciones pasa por todo el procedimiento de esterilización que se exige en todos los hospitales. Somos tan exigentes con nosotros mismos que, periódicamente, se llama a Sanidad para que vayan a hacer los cultivos. Se hacen cultivos de los pisos, de las mesas, de todo lo que hay en la Sala. Se toman todas las precauciones debidas.

P. ¿Para evitar infecciones?

R. Sí, señor. Y, cuando hay que intervenir en un caso como éste, al día siguiente hay que empezar a lavar desde el techo y las paredes.

P. En su opinión como médico y luego de hacer un análisis de todo lo que usted ha podido palpar, ¿cómo diría usted que encontró la infección?

Lic. Sequeira:

Es una opinión que se le pide de cómo es que se contrae.

R. ¿Puedo contestar?

Hon. Juez Polo:

P. Sí.

R. Que la contrajo en el momento de producirse la herida.

.    .    .    .    .    .    .    .

P. Le pregunto yo qué normas adopta la Clínica Susoni con respecto a la sanidad del local en sí, la habitación, sala de operaciones, etc.

Dr. Susoni:

En los cuartos, cuando se va un paciente, se hace la higiene normal. Si es caso infeccioso, se hace fumigamiento y lo que requiere Sanidad y, en la sala de operaciones, se hace asepsia contínuamente, y eso lo hace el Departamento de Sanidad a petición nuestra.

P. Y, ¿esto se hizo mientras estuvo Norman Torres Pérez recluído allí?

R. Siempre se ha hecho."

(d) La prueba de la condición en que quedó colocado el yeso fue conflictiva: La doctora Miranda testificó que luego de fraguado el yeso en la pierna lo abrió de arriba abajo, completo; que al paciente se le puso "TAT antitetánica y antigangrenosa así como penicilina y suero." El Dr. Julio Rodríguez Olmo testificó que en su carácter de supervisor verificó que todo el tratamiento anterior había sido suministrado al paciente por la referida doctora. El récord del paciente indica que el molde de yeso fue dividido en dos (*bivalved*). Tanto el recurrente como el testigo Félix Manuel Freytes amigo que visitaba al recurrente testificaron que el molde era sólido, sin aberturas y que fue el Dr. Ramón del Toro quien abrió el yeso el viernes por la tarde con una sierra y luego con la ayuda del testigo introdujo una paletita en la hendidura para que permaneciera abierta. El recurrente se quejaba contínuamente de que el molde de yeso le oprimía la pierna excesiva y contínuamente.

Los médicos testificaron que cuando se contrae gangrena se siente la parte afectada oprimida aunque no esté cubierto con molde de yeso. Los médicos además testificaron que la gangrena de tipo esquémico (otro tipo de gangrena distinta de la gaseosa) puede producirse por compresión; que la gaseosa se produce "por una entrada de bacterias en una herida"; que "toda herida al producirse está contaminada"; que "una herida de esa naturaleza [la que sufrió el recurrente] podía contaminarse con bacterias que produjeran una gangrena gaseosa"; que de haberse producido gangrena por apretamiento no se hubiese sentido "el crepito del gas" en la pierna; que la gangrena gaseosa no puede producirse por un yeso que quede apretado; ". . . si no hay bacteria, no puede producirse"; que para prevenirla es conveniente que el yeso no quede apretado pues la falta de circulación resultante del apretamiento "lo que puede es predisponer y ayudar en la creación de bacterias".

Testificó el Dr. Rodríguez Olmo que el yeso apretado, de por sí, no produce gangrena gaseosa, "pero si hay una infección de bacterias y una compresión, esa compresión va a ser favorable para la producción de esa gangrena gaseosa, pero, no producirla de por sí."

El propio testigo del recurrente, Dr. Aníbal Lugo, testificó que el abrir el yeso luego de fraguado (como testificó la Dra. Miranda que lo hizo en el caso del recurrente) es una buena práctica, pero que él no lo hace en sus casos porque "el yeso circular completo da más estabilidad"; que la gangrena gaseosa "se inicia en el momento del traumatismo . . . el organismo que causa esto es notable, porque es prevaleciente en cualquier sitio . . . cuando el yeso queda apretado y la pierna se hincha produciría el estado de falta de nutrición y de anaerobismo que se necesita para que se desarrolle una infección, pero, en presencia de una herida abierta"; que es típico de un caso como el del recurrente que sienta apretamiento además de dolor; que "la gangrena gaseosa no se puede producir por compresión solamente, sinó que tiene que haber dentro del organismo la bacteria infecciosa"; que al recurrente se le hizo todo lo que se podía haber hecho para controlar su situación.

(e) El recurrente presentó prueba de que la dislocación compuesta de la rodilla con una herida incisa en la región poplitea es una lesión severa, de relativa poca frecuencia. El Dr. Lugo testificó que un cirujano está mejor equipado que un médico para atenderla pero que cuando no hay otras facilidades para atender un caso como ése, el médico, debe actuar; que aun teniendo la experiencia "Siempre es bueno delegar responsabilidad en otro . . . y aún teniendo la experiencia, es bueno tener ayuda de otro."

La doctora Miranda testificó que "tenía bastante experiencia en cirugía"; que había puesto yeso muchas veces; que había tratado el tipo de dislocación del recurrente varias veces; que "la placa demuestra que redujo la dislocación

bien" (en el caso del recurrente); que aunque no le tomó el pulso después de la reducción verificó la circulación de la sección distal de la pierna y ésta no estaba ni fría ni cianótica; las piernas estaban calientes y de un color normal; que la falta de circulación puede producir gangrena esquémica.

La prueba demostró, que el Dr. Rodríguez Olmo, supervisor de la Dra. Miranda llegó a la sala de operaciones donde estaba el recurrente antes de enyesarse la pierna. Testificó que al día siguiente volvió a verlo; lo encontró en estado satisfactorio; el color de sus dedos y la temperatura eran completamente normales que lo veía todos los días y que ni el paciente ni persona otra alguna se le quejó de que el yeso estuviese apretado; la lesión del recurrente se atendió en forma correcta "porque vi, parte del tratamiento", que "sé que estuve hasta reducida, cuando vi que estaba reducida y su configuración anatómica era perfecta"; que se siguieron los procedimientos adecuados, "además es la rutina del hospital."

A la luz del anterior resumen de la prueba concluimos que el juez de instancia no incidió al concluir, en efecto, que el recurrente no estableció que la gangrena gaseosa fue causada por un acto negligente u omisión de los recurridos.

*En vista de lo expuesto se confirmará la sentencia del Tribunal Superior, Sala de San Juan, de 28 de enero de 1964.*