Opinión disidente emitida por la
Jueza Asociada Señora Pabón Chameco, a la que se le une el Juez Asociado Señor Martínez Torres.
Todo paciente tiene el derecho a consentir y a rechazar un tratamiento médico. No obstante, este derecho no es absoluto. Mediante la Ley Núm. 160 de 17 de noviembre de 2001, conocida como la Ley de Declaración Previa de Voluntad sobre Tratamiento Médico en Caso de Sufrir una Condición de Salud Terminal o de Estado Vegetativo Persistente, 24 L.P.R.A. see. 3651 et seq., la Asamblea Legislativa estableció los parámetros necesarios para hacer viable ese derecho, luego de un minucioso escrutinio de las diversas implicaciones que su ejercicio conlleva. Por lo tanto, disiento respetuosamente de la opinión mayoritaria respecto a la declaración de inconstitucionalidad del Art. 6 de la Ley Núm. 160 (24 L.P.R.A. see. 3655).
Además, la determinación de la existencia de un derecho a rechazar un tratamiento médico, sin sujeción a condición o limite algunos que el que “su ejercicio cause grave daño a la vida de terceras personas”, descarta, como consecuencia, todos los intereses del Estado que han sido, a su vez, reconocidos por los distintos tribunales estatales y federales.
*952 I
El 5 de abril de 2004, el Sr. Víctor Hernández Laboy (el declarante o mandante), quien era feligrés de una congregación de los Testigos de Jehová, administrada por la Congregación Cristiana de los Testigos de Jehová de Puerto Rico, Inc., otorgó un documento intitulado “Designación de Mandatario para la Atención Médica” (la Declaración de Voluntad). Éste fue otorgado en conformidad con la Ley Núm. 160, supra.
La Declaración de Voluntad incluía el rechazo absoluto a la administración de sangre. Además, expresaba el deseo del declarante a que no se le prolongara su vida de no haber esperanza de vida o de estar desahuciado, y designaba al Sr. Roberto Tirado Flecha como mandatario primario para atención médica “[e]n virtud de la Ley 160 del 17 de noviembre de 2001 y ante la eventualidad de ser víctima de una enfermedad terminal o de estado vegetativo persistente”. Apéndice 1 de la Petición de certiorari, pág. 47.
El 17 de junio de 2005, el declarante sufrió un accidente automovilístico que le causó lesiones graves por lo que fue recluido en la Unidad de Trauma Intensivo del Centro Médico de San Juan. Su esposa, la Sra. Luz E. Lozada Tirado, solicitó al Tribunal Municipal de Humacao que emitiera una orden para autorizar la transfusión de sangre para el declarante. El 22 de junio de 2005, dicho foro emitió una orden ex parte dirigida a la Unidad de Trauma Intensivo, en la que dispuso transfundir al paciente y ordenó cualquier otro procedimiento médico que su condición requiriera para la preservación de la vida.
Por su parte, el Sr. Roberto Tirado Flecha presentó al hospital la Declaración de Voluntad del declarante que lo designaba como su mandatario y se opuso a la transfusión de sangre. Como consecuencia, el Centro Médico se negó a acatar la orden emitida por el Tribunal Municipal de Huma *953 cao, por lo que el 23 de junio de 2005 la señora Lozada Tirado y sus hijos (los recurridos) acudieron ante el Tribunal de Primera Instancia, Sala Superior de San Juan, y solicitaron que se ordenara la transfusión de sangre, así como cualquier otro procedimiento médico que requiriera la condición del declarante. Ese mismo día, luego de escuchar el testimonio de los recurridos donde éstos expresaron que el declarante se encontraba inconsciente y en peligro de muerte, el tribunal emitió una Resolución en la que concedió el petitorio y ordenó al Centro Médico a transfundir sangre o dializar al declarante, de requerirlo su condición de salud.
Así las cosas, al día siguiente se celebró una segunda vista para considerar los planteamientos del Sr. Roberto Tirado Flecha, quien alegó ser mandatario del declarante. A tales efectos, presentó la Declaración de Voluntad suscrita por el declarante en la que lo designaba como su mandatario, según la Ley Núm. 160, supra. A su vez, argumentó ante dicho foro que la Resolución emitida el 23 de junio de 2005 constituía una violación de los derechos a la libertad de culto y privacidad del declarante. Por su parte, los recurridos alegaron la existencia de circunstancias apremiantes que justificaban la intervención del tribunal con la decisión del declarante de no aceptar sangre: el bienestar de un hijo menor de edad.(1) El tribunal resolvió mantener en vigor la resolución emitida el 23 de junio de 2005, por entender que existía un interés apremiante del Estado para obligar al declarante a recibir sangre y a ser dializado.(2) El hospital, *954 entonces, procedió con la transfusión. A los pocos días, el declarante falleció.
Inconformes, el Sr. Roberto Tirado Flecha y la congregación religiosa, a la que el declarante pertenecía en vida, recurrieron la citada resolución ante el Tribunal de Apelaciones. Ese foro concluyó que éstos carecían de legitimación activa para presentar el recurso de certiorari. El tribunal a quo resolvió que el Sr. Roberto Tirado Flecha no estaba legitimado para actuar como mandatario ante los tribunales por no probar la condición médica del declarante. La prueba era requerida para que la Declaración de Voluntad y, a su vez, el mandato advinieran ejecutables. Por otra parte, dictaminó que la Congregación Cristiana de los Testigos de Jehová de Puerto Rico, Inc., tampoco contaba con legitimación activa para cuestionar la resolución, por no haber sido parte en los procedimientos ante el tribunal de instancia. Insatisfechos, el Sr. Roberto Tirado Flecha y la congregación religiosa acuden ante este Foro.
II
En Puerto Rico se ha reconocido que “el derecho de todo paciente a la autodeterminación, es decir, a decidir libremente que debe hacerse con su cuerpo [con relación a tratamientos médicos] está protegido por los tribunales. Como regla general implica la previa prestación del consentimiento informado del paciente para toda intervención quirúrgica”. Sepúlveda de Arrieta v. Barreto, 137 D.P.R. 735, 742 (1994).(3) De este derecho se desprende, a su vez, *955 como cuestión lógica, el derecho del paciente a rechazar un tratamiento médico. Véanse: Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261, 270 (1990). Véanse, además: S. Becker, Health Care Law: A Practical Guide, 2da ed., Nueva York, Ed. Matthew Bender Lexis, 2008, Sec. 19, págs. 19—27 a 19—28; F.A. Rozovsky, Consent to Treatment: A Practical Guide, New York, Ed. Matthew Bender, 2007, Sec. 7.01, pág. 7—3; R.S. Olick, Taking Advance Directives Seriously: Prospective Autonomy and Decisions near the End of Life, Washington, D.C., Georgetown U. Press, 2001, pág. 9. No obstante, este derecho no es absoluto. Véanse: Torres Pérez v. Hosp. Dr. Susoni, Inc., 95 D.P.R. 867 (1968); Montes v. Fondo del Seguro del Estado, 87 D.P.R. 199 (1963); Rojas v. Maldonado, 68 D.P.R. 818 (1948).
La Asamblea Legislativa, en reconocimiento al derecho a la intimidad, la autonomía individual y la dignidad humana,(4) ha dispuesto, mediante la Ley Núm. 160, supra, entre otros extremos, de una forma determinada para evidenciar: (1) la voluntad sobre la aceptación o el rechazo de un tratamiento médico para aquellos momentos especificados en la ley en los que el declarante se encuentre incapacitado para expresarla;(5) (2) la figura de un mandatario capaz de tomar decisiones en momentos de incapaeidad;(6) *956 (3) el mandato a los médicos e instituciones de servicios a cumplir con su voluntad; (4) la concesión expresa de inmunidad civil o criminal a los médicos, instituciones de servicio de salud y otras personas señaladas en la ley por hacer valer las disposiciones de la ley y, por consiguiente, la voluntad del paciente, y (5) la designación de un subrogado designado, conforme al orden sucesoral, en caso de que el declarante no haya dispuesto sobre ello. Tales disposiciones promueven el derecho a la autodeterminación del paciente que, estando consciente, expresó su voluntad sobre el tratamiento médico.
La primera y segunda de las premisas citadas fueron reconocidas y condicionadas previamente en la Ley Núm. 194 de 25 de agosto de 2000, según enmendada, conocida como “Carta de Derechos y Responsabilidades del Paciente”, 24 L.P.R.A. sec. 3041 et seq.(7) Expresa en el inciso (b) de su Art. 9 que:
*957 Todo médico o profesional de la salud deberá proveer a sus pacientes información suficiente y adecuada, así como la oportunidad real, de participar en forma significativa en las decisiones relacionadas con su cuidado médico y de salud, de manera que dicho paciente pueda prestar su consentimiento a dichas decisiones, incluyendo, pero sin limitarse a, la discusión de opciones de tratamiento de una manera que dicho paciente entienda las mismas, y la opción de rehusar o no recibir ningún tratamiento, así como todos los costos, riesgos y probabilidades de éxito de dichas opciones de tratamiento o no tratamiento y cualquier preferencia futura del paciente en caso de que en determinado momento éste pueda perder la capacidad de expresar válidamente su consentimiento a distintas opciones de tratamiento. 24 L.P.R.A. sec. 3047(b).
Por su parte, el inciso (c) del Art. 9 de la Ley Núm. 194, dispone del derecho al
... uso de directrices o guías adelantadas en relación a su tratamiento, o designar a una persona que actué como su tutor en caso de ser necesario para la toma de decisiones. Todo médico o profesional de la salud deberá discutir con sus pacientes *958 y los familiares de éstos el uso de directrices o guías adelantadas de preferencia, incluyendo, pero sin limitarse a, el uso de poderes y testamentos vivientes (living wills). El proveedor honrará dicho deseo hasta donde éste sea permitido por ley. (Énfasis suplido.) 24 L.P.R.A. sec. 3047(c).
Es nuestra contención que, en respuesta a esta disposición de la Ley Núm. 194, supra, la Asamblea Legislativa promulgó la Ley Núm. 160, supra, estableciendo los parámetros necesarios para hacer viable ese derecho.
Por lo tanto, la Ley Núm. 160, supra, es, además, un esfuerzo de la Asamblea Legislativa para hacer viables los derechos de pacientes, reconocidos de forma general y condicionados mediante la Ley Núm. 194, supra. La citada Ley Núm. 160 crea mecanismos para proteger la voluntad del declarante. Al igual que en algunos Estados de la Unión, donde se han ido desarrollando paulatinamente sus respectivos ordenamientos jurídicos para posibilitar estos derechos, le corresponde a la Asamblea Legislativa actuar al respecto, a fin de considerar la complejidad de las controversias relacionadas particularmente con el derecho al rechazo del tratamiento médico y los intereses estatales que representa. Esto, por las implicaciones médicas, jurídicas, bioéticas, políticas, religiosas, culturales y familiares que conllevan. Por estas mismas razones, las controversias que sean presentadas ante los tribunales deben ser analizadas caso a caso.
La opinión que emite hoy este Tribunal expresa que el Art. 6 de la Ley Núm. 160, supra, anula la voluntad del declarante, al infringir sus derechos constitucionales tanto según la Constitución de Puerto Rico como por la Constitución de Estados Unidos. Particularmente, señala que el ordenamiento constitucional protege el derecho de las personas a rechazar el tratamiento médico expresado de forma anticipada, sin estar sujeto a las condiciones dispuestas en el Art. 6 de la Ley Núm. 160, supra, o ninguna otra. Expresa, a la luz de lo resuelto en Cruzan v. Director, Missouri Dept. of Health, supra, que la voluntad del pa *959 cíente mayor de edad debe respetarse cuando: es informada; éste es consciente de las posibles consecuencias de su decisión; existe evidencia clara y convincente de su voluntad, y está sujeta a un balance entre la voluntad del paciente y los intereses apremiantes del Estado.
El Tribunal Supremo de Estados Unidos en Cruzan v. Director, Missouri Dept. of Health, supra, caso en el que los padres solicitaron a nombre de su hija en estado vegetativo, que se ordenara la remoción del equipo de nutrición e hidratación, presumió, con relación a los hechos de dicho caso en particular, la existencia del derecho de un paciente competente a rehusar la nutrición e hidratación como interés libertario protegido por la Cláusula del Debido Proceso de Ley de la Constitución de Estados Unidos.(8) Emda. XIV, Const. EE.UU., L.P.R.A., Tomo 1, pág. 206. Asimismo, señaló que, según el derecho común anglosajón, una persona tiene el derecho a determinar qué hacer con su cuerpo y que, como corolario lógico, el paciente tiene el derecho a rechazar un tratamiento. Sin embargo, para decidir si sus derechos constitucionales han sido violados, expresa que se *960 debe realizar un balance de intereses libertarios con aquellos intereses relevantes del Estado.
Diversas jurisdicciones han reconocido cuatro intereses estatales que pueden limitar el derecho del paciente a rechazar un tratamiento médico: (1) la preservación de la vida humana;(9) (2) la prevención del suicidio; (3) la protección de la integridad ética de la clase médica, y (4) la protección de terceros inocentes. Cruzan v. Director, Missouri Dept. of Health, supra. La opinión que emite este Tribunal concluye que el derecho al rechazo de un tratamiento médico está sujeto sólo al requisito de evidencia clara y convincente de que esa “hubiese sido la decisión del paciente y al balance de aquellos intereses apremiantes que pudiera invocar el Estado”. Opinión mayoritaria, pág. 933. No obstante, prácticamente descarta todos los intereses del Estado que han sido reconocidos por otros tribunales estatales y por el Tribunal Supremo de Estados Unidos, admitiendo como único limite a dicho derecho el que el rechazo “cause grave daño a la vida de terceras personas”.(10) Tal proceder es aún más amplio que las decisiones que *961 toma como referencia y reconoce un derecho absoluto al rechazo de tratamiento médico. Este derecho no es absoluto, aún cuando esté fundamentado en el derecho común anglosajón o en el ordenamiento constitucional.(11)
El alcance de las determinaciones esbozadas por el Tribunal debe ser analizado con sumo cuidado. El Tribunal Supremo Federal, así como aquellos tribunales estatales en cuyas decisiones se fundamentan tales conclusiones, se han limitado a adjudicar los hechos particulares de cada *962 caso.(12) Además, las determinaciones realizadas en varias jurisdicciones se han desarrollado a la luz de los cambios legislativos.(13)
III
El desarrollo de la tecnología médica ha dado paso a diversas interrogantes que pueden surgir por el derecho a rechazar tratamiento médico de los individuos y que no han podido ser resueltas por los tribunales estatales ni federales.(14) La intención del legislador, de proteger la voluntad del declarante sobre los tratamientos que habrían de realizarse en su cuerpo en situaciones de incapacidad, nos merece el más profundo respeto. Reafirmamos que le compete a la Asamblea Legislativa ir desarrollando nuestro ordenamiento jurídico al respecto, particularmente cuando la prueba, como ocurre en este caso, está fragmentada e incompleta, que conlleva una especulación de nuestra parte. Por estas mismas razones, no podemos estar con-testes con la conclusión de la opinión de este Tribunal de que el Art. 6 de la Ley Núm. 160, supra, constituye una violación a los derechos constitucionales del declarante según las Constituciones de Estados Unidos y Puerto Rico.
*963 En vista de todo lo anterior, disiento respetuosamente de la opinión que emite este Tribunal.

 Surge de los autos que la señora Lozada Tirado “testificó que procreó seis hijos con [el señor] Hernández Laboy [pero] éstos no residen cerca. Aclaró que el menor ... es hijo biológico de su hijo Fabián Hernández Lozada quien falleció. Ella y su esposo [lo] adoptaron legalmente”. Apéndice VI de la Petición de certoriari, pág. 56.

 Concluyó el tribunal de instancia que la peticionaria “es una mujer de escasos recursos económicos y de una capacidad intelectual baja. El cuadro que nos presenta la testigo, nos hace concluir que ella sola no puede hacerse cargo del menor .... Además, el menor podría afectarse emocionalmente con la pérdida de su padre adoptivo habiendo perdido hace poco tiempo a su padre biológico”. Apéndice VI de la Petición de certiorari, pág. 59.

 Nuestra jurisprudencia ha reconocido el derecho de un paciente a consentir a un tratamiento médico, conforme a la doctrina del consentimiento informado originada en el derecho común anglosajón. Véanse: Santiago Otero v. Méndez, 135 D.P.R. 540, 557 esc. 24 (1994) (este caso refiere a jurisprudencia que reconoce la doctrina del consentimiento informado en nuestro ordenamiento); Rodríguez Crespo v. Hernández, 121 D.P.R. 639 (1988); Ríos Ruiz v. Mark, 119 D.P.R. 816 (1987); Torres Pérez v. Hosp. Dr. Susoni, Inc., 95 D.P.R. 867 (1968); Montes v. Fondo del Seguro del Estado, 87 D.P.R. 199 (1963); Rojas v. Maldonado, 68 D.P.R. 818 (1948). Véase, además, Union Pacific *955 Railway Co. v. Botsford, 141 U.S. 250, 251 (1891) (“No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law”).

 Exposición de Motivos de la Ley Núm. 160 (2001 (Parte 1) Leyes de Puerto Rico 809).

 La declaración previa de voluntad de tratamiento médico, conocida en ingles como living will, es un tipo de directriz adelantada. Este es un documento suscrito por una persona competente, por el cual se comunica a los demás que intervenciones médicas no se desean, en caso de sufrir una enfermedad terminal o estar en estado vegetativo persistente. T. McConnell, Inalienable Rights: The Limits of Consent in Medicine and the Law, N.C., Ed. Oxford University Press, 2000, pág. 112.

 Otro tipo de directrices adelantadas es el poder para la atención médica. McConnell, op. cit. (“A health care power of attorney is a document in which one designates another specific individual to make ones medical decisions if and when one no longer has the capacity to do so oneself. The sort of health care decisions that a health care agent may make for the person for whom she is a proxy varies form state to state”).

 De especial relevancia nos es la Exposición de Motivos de la Ley Núm. 194 de 25 de agosto de 2000 (2000 (Parte 2) Leyes de Puerto Rico 1274-1276), la cual esboza la intención de la Asamblea Legislativa al aprobar el estatuto:
“Uno de los principales objetivos del Gobierno de Puerto Rico en años recientes ha sido lograr que todos los ciudadanos tengan acceso adecuado a servicios y facilidades de salud médico-hospitalarias de calidad, de acuerdo con sus necesidades e irrespectivamente de su condición socioeconómica y capacidad de pago. Esta importante meta social, que en gran medida representa el cumplimiento de un compromiso latente en la Constitución de Puerto Rico, surge del convencimiento, demostrado por la experiencia acumulada de varias décadas, de que el acceso adecuado a servicios de salud de calidad es un componente esencial en cualquier definición válida del concepto de calidad de vida, así como un derecho humano fundamental.
“Para cumplir con ese compromiso vital con el pueblo de Puerto Rico se han aprobado en años recientes numerosas leyes y se han implantado numerosas medidas administrativas y actuaciones ejecutivas encaminadas a hacer realidad el sueño de proveer a cada familia puertorriqueña de un acceso adecuado a servicios médicos de calidad, sin consideración alguna a su condición socioeconómica. Esta importante meta es ya realidad en gran medida, gracias a la aprobación de la Ley Núm. 72 de 7 de septiembre de 1993, conocida como ‘Ley de la Administración de Seguros de Salud de Puerto Rico’. Sin embargo, para proteger la salud de nuestro pueblo no es suficiente asegurar la disponibilidad y acceso a servicios de calidad, también es necesario que los usuarios de servicios de salud conozcan sus derechos y responsabilidades y tengan disponible toda la información necesaria para tomar sus propias decisiones.
“Los cambios recientes en la industria de servicios de salud médico-hospitalarios también abonan a la búsqueda de medios para asegurar que los usuarios y consumidores de tales servicios tengan toda la información pertinente a su disposición a la hora de seleccionar los servicios de salud médico-hospitalarios que utilizarán. El énfasis cada día mayor en el control y reducción de costos en el cuidado *957 de la salud, la limitación de beneficios y alternativas de tratamiento en numerosos programas y planes, el enfoque preventivo en el cuidado de la salud y la proliferación de planes y programas de cuidado dirigido (managed care) y de organizaciones de cuidado preventivo de la salud (health maintenance organizations o HMOs por sus siglas en inglés) hacen aún más importante el garantizar el libre flujo de información completa, fidedigna y veraz a los usuarios y consumidores de los servicios de salud. Es importante que los usuarios y consumidores de tales servicios estén conscientes no sólo de sus derechos sino también de sus responsabilidades, tanto económicas como de cualquier otra clase, bajo las distintas alternativas de servicios de salud y tratamiento que tienen a su disposición. En última instancia, se trata de dos caras de la misma moneda, es decir, de procurar que la población que utiliza tales servicios lo haga con plena conciencia de sus derechos y deberes, de sus prerrogativas y responsabilidades, bajo las alternativas disponibles.
“La promulgación de esta Ley contribuirá visiblemente a la formación de un público mejor informado, más consciente, más responsable y seguramente más saludable, lo cual tendrá el efecto de promover una utilización más eficiente de los recursos disponibles en esta importante área y redundará a largo plazo en considerable provecho para el pueblo de Puerto Rico. Se trata, a fin de cuentas, de un componente adicional en la reforma de salud y de una herramienta más en la búsqueda constante de alternativas y soluciones a los problemas de salud de nuestro pueblo, sobre todo del sector menos aventajado económicamente.
“Por último, la inclusión de penalidades a proveedores y aseguradores de servicios de salud médico-hospitalarios por incumplir con ciertos requisitos de esta Ley, incluyendo no divulgar la totalidad de la información requerida por esta Ley o divulgar intencionalmente o a sabiendas información falsa, asegura que los consumidores tendrán la información que necesitan y requieren para tomar las decisiones que atañen uno de los aspectos más importantes en la vida de todo ser humano: las decisiones relativas a la salud propia y de los seres queridos.”

 La opinión apunta que el derecho a rechazar un tratamiento médico está protegido por las Constituciones de Estados Unidos y de Puerto Rico. No obstante, “[t]here was a 5 to 4 division of the Justices in [Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261, 270 (1990)] and the ruling in the case was a narrow one. The concurring opinion of Justice O’Connor in Cruzan, and dicta in the majority opinion, resulted in the states being left with little guidance regarding whether they were required to recognize any type of right to refuse life sustaining medical treatment”. 4 Rotunda and Nowak, Treatise on Constitutional Law: Substance and Procedure, Sec. 18.30(c), pág. 208 (2007). Véase, además, Conservatorship of Wendland, 28 P.3d 151, 159 (Cal. 2001) (“Federal law has little to say about the competent person’s right to refuse treatment, but what it does say is not to the contrary”).
Aunque el Tribunal Supremo de Estados Unidos hizo mención del caso Matter of Quinlan, 355 A.2d 647 (1976), que determinara que la paciente tenía un derecho a la intimidad fundamentado en la Constitución de Estados Unidos para rechazar un tratamiento, el más Alto Foro Federal no lo reconoció. Además, cabe señalar que “[l]a controversia que le fue planteada al Tribunal Supremo federal giró en torno a si un requisito evidenciario del Estado de Missouri era inconstitucional. En realidad, la controversia presentada [en Cruzan v. Director, Missouri Dept. of Health, supra] no fue el reconocimiento de un derecho constitucional a morir manifestado a través del rechazo de tratamiento médico vital”. T. Medina Monteserrín, El derecho a una muerte natural: manifestación última de la libertad personal y de la autonomía individual, 60 (Núm. 1) Rev. Jur. U.P.R. 295, 299 esc. 18 (1991).

 El Tribunal Supremo federal ha dado particular apoyo a un “unqualified interest in the preservation of human life” del Estado. Cruzan v. Director, supra, pág. 282. Véase, en el contexto del suicidio asistido, Washington v. Glucksberg, 521 U.S. 702 (1997). Además, se ha reconocido que el interés del Estado en autorizar un tratamiento médico disminuye, mientras el derecho a la autodeterminación aumenta según el grado de invasión corporal aumenta y el pronóstico médico disminuye. Rasmussen by Mitchell v. Fleming, 741 P.2d 674, 683 (Ariz. 1987) (“Although the state’s interest in preserving life is justifiably strong, we believe this interest necessarily weakens and must yield to the patient's interest where treatment at issue ‘serves only to prolong a life inflicted with an incurable condition’ ”). Véase, además, Matter of Quinlan, supra, pág. 664. No obstante, no contamos con este tipo de información en el caso de autos.

 Además, la opinión mayoritaria estudia el posible abandono del menor. No obstante, utiliza como análisis el “total abandono de un hijo menor de edad”. Entendemos que el término “total” es demasiado amplio, ambiguo y no se sostiene de una lectura de los casos citados. Asimismo, los casos empleados para adoptar dicho análisis son distinguibles de los hechos del caso de auto. En Stamford Hosp. v. Vega, 674 A. 2d 821 (1996), el Tribunal Supremo de Connecticut analizó el derecho a rechazar el tratamiento médico de la paciente, madre de un recién nacido, y los intereses del hospital. Esto debido a que determinó que el hospital no debía representar los intereses del Estado, pero sí podía recurrir al foro judicial con relación a sus propios intereses. Fue a la luz del interés del hospital y no del Estado —en caso de un posible abandono de uno de sus pacientes— que el Tribunal analizó la controversia.
*961 Asimismo, en Matter of Dubreuil, 629 So. 2d 819 (1993), el Tribunal Supremo de Florida determinó que es el Estado quien tiene el peso de defender los intereses estatales y, por lo tanto, éste debe ser informado de los procedimientos alejándose así de Public Health Tr. of Dade County v. Wons, 541 So.2d 96 (1989). No obstante, el Tribunal entra en los méritos del caso, debido a que el hospital asumió por el Estado el peso de la prueba respecto al interés en proteger a terceros inocentes. Además, Patricia Dubreuil, feligrés de una Congregación de los Testigos de Jehová y, además, madre de cuatro menores, sobrevivió luego de las transfusiones de sangre a las que fue sometida. Entonces, Dubreuil solicitó una reconsideración y durante tal etapa sometió un testimonio por el que hizo constar que miembros de su familia y amigos estaban dispuestos a ayudar en la crianza de los menores en caso de su muerte. El Tribunal Supremo valoró dicho testimonio en conjunción con que no surgía del expediente prueba de un posible abandono en caso de morir Dubreuil por falta de tratamiento médico y de la presunción de que el padre sobreviviente tendría entera responsabilidad legal sobre el cuidado de los menores.
Por otro lado, en Fosmire v. Nicoleau, 551 N.E.2d 77 (1990), el más alto foro del estado de Nueva York dispuso que la paciente, adulta y competente, tiene el derecho a rechazar un tratamiento médico sin importar que sea madre, debido a que no se demostró un interés superior del Estado y que tal derecho está reconocido por el derecho común anglosajón y avalado por el derecho estatutario y principios constitucionales. El Tribunal señaló que en dicho caso no decidía respecto a un paciente que mientras era competente expresó su rechazo a tratamiento en circunstancias específicas y que posteriormente advino incompetente.
En Norwood Hosp. v. Muñoz, 564 N.E.2d 1017 (1991), el Tribunal Supremo de Massachusetts también analizó el interés estatal de proteger a terceras personas. Concluyó que no se presentó evidencia convincente del abandono del menor en caso de la muerte de su madre. Por el contrario, el padre del menor apoyaba la voluntad de su esposa; contaba con los recursos económicos para cuidar al menor y con familiares que lo apoyarían en su crianza.

 “El derecho a la intimidad no necesita de legislación habilitadora que le insufle vida ya que opera por su propia fuerza, ex proprio vigore.” Rexach v. Ramírez, 162 D.P.R. 130, 144 (2004). “No obstante, [éste] no es un derecho absoluto, ni Vence a todo valor en conflicto bajo todo supuesto posible’.” Castro v. Tiendas Pitusa, 159 D.P.R. 650, 659 (2003). Por otra parte, respecto a la libertad de culto hemos expresado que “la libertad de actuar, al amparo de una práctica religiosa, está forzosamente limitada o restringida para proteger la paz, la moral y el orden público ya que de otra manera se instituiría un cantón aparte donde le estaría vedado al gobierno hacer respetar las leyes de protección social”. Mercado, Quilichini v. U.C.P.R., 143 D.P.R. 610, 636 (1997).

 Cruzan v. Director, Missouri Dept. of Health, supra, págs. 277-278, citando a Twin City Bank v. Nebeker, 167 U.S. 196, 202 (1897) (“a question of such magnitude and importance ... it is the [better] part of wisdom not to attempt, by any general statement, to cover every possible phase of the subject”). (Corchetes en el original).

 A modo de ejemplo, en Conservatorship of Wendland, supra, pág. 159, el Tribunal Supremo de California nos guía a través del desarrollo legislativo y judicial del Estado en lo referente al rechazo de tratamiento médico.
Además, cabe señalar que la Ley Modelo sobre Directrices Anticipadas, 9 U.L.A. 83 (1993), conocida en inglés como Uniform Health-Care Decisions Act, se ha ampliado para reconocer la voluntad de la persona en toda circunstancia en la que no se pueda comunicar sin definir enfermedades o condiciones que limiten su ejecutabilidad. Stephanie K. Marshall señala que, entre 1993 a 2007, solamente nueve estados habían adoptado aspectos de esta ley modelo. S.K Marshall, Advance Directives: A Legal Research Guide, Buffalo, Ed. William S. Hein & Co., Inc., 2008, pág. 25.

 Rotunda and Nowak, supra, Vol. 6, Sec. 21.9(b)(iii), pág. 224.